UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

STACEY HOLDEN,                    )
                                  )
            Plaintiff,            )
                                  )
        v.                        )    No.  4:10CV742 RWS
                                  )                   (FRB)
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

        This cause is before the Court on plaintiff's appeal of
an adverse ruling of the Social Security Administration.  All
pretrial matters were referred to the undersigned United States
Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate
disposition.

**I.  Procedural History**

        On October 17, 2007, plaintiff filed an application for
Disability Insurance Benefits pursuant to Title II of the Social
Security Act, 42 U.S.C. §§ 401, et seq., and an application for
Supplemental Security Income (SSI) pursuant to Title XVI of the
Act, 42 U.S.C. §§ 1381, et seq., in which he alleged that he became
disabled on June 1, 1997.  (Tr. 172-75, 176-83.)  On initial
consideration, the Social Security Administration denied
plaintiff's claims for benefits.  (Tr. 107-11, 103-05.)  On
November 12, 2008, upon plaintiff's request, a hearing was held

before an Administrative Law Judge (ALJ) at which plaintiff testified. (Tr. 38-96.) Plaintiff's daughter and a vocational expert also testified at the hearing. After completion of consultative examinations, another hearing was held on May 27, 2009. (Tr. 22-37.) Plaintiff testified and was represented by counsel. A vocational expert also testified at the hearing. On June 22, 2009, the ALJ issued a decision denying plaintiff's claims for benefits. (Tr. 10-21.) On February 23, 2010, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Hearing Held November 12, 2008</u>

    1. *Plaintiff's Testimony*

Plaintiff was not represented at the hearing on November 12, 2008. At the hearing, plaintiff testified in response to questions posed by the ALJ.

At the time of the hearing, plaintiff was forty-four years of age. Plaintiff stands five feet, eleven inches tall and weighs 238 pounds. Plaintiff is right-handed. Plaintiff is divorced and has three children. Plaintiff lives in a house with his sister and has done so since his most recent surgery. (Tr. 47-48.) Plaintiff completed high school and attended college for one year. (Tr. 53.) Other than taking management classes associated

with his employment at the Department of Corrections, plaintiff has received no vocational or other training. (Tr. 54.) Plaintiff receives food stamps but no other form of state or federal aid. Plaintiff does not have medical insurance. (Tr. 50.) Plaintiff testified that he filed a worker's compensation claim in 2007, and that the case was still pending. (Tr. 50-51.)

From 1988 to 2000, plaintiff worked intermittently as a school bus driver. From 1992 to November 2005, plaintiff worked intermittently as a cook in a restaurant/brewery. From 1993 to 1999, plaintiff worked as a corrections officer at the City Jail. From 2000 to 2002, plaintiff worked as an inspector for emissions testing with the State of Missouri. From July 2006 to October 2007, plaintiff worked at a convenience store performing stocking and maintenance duties. (Tr. 232.) Plaintiff testified that he was terminated from this job in October 2007. (Tr. 54-55.) Plaintiff testified that he has applied for other jobs since October 2007, without success. Plaintiff testified that he has not sought any employment since his surgery in July 2008. (Tr. 55.)

Plaintiff testified that he was first injured during a riot while employed at the City Jail. Plaintiff testified that numerous areas of his body were struck with broken cinder blocks and that he was subsequently diagnosed with chondromalacia, underwent laparoscopic surgery, and participated in physical therapy. (Tr. 52.) Plaintiff testified that he missed a lot of

work and that his doctor advised him that his job needed to be modified on account of his condition. Plaintiff testified that he was eventually fired from his job, but was reinstated in exchange for his dropping a complaint against the department. (Tr. 53.) Plaintiff testified that he believes that the onset of his disability occurred around this time. Plaintiff testified that although he worked subsequent to his alleged onset date of disability, he came to learn that the type of work he was performing worsened his condition. (Tr. 56.)

Plaintiff testified that he has pain in his lower extremities and in his arms. (Tr. 69.) Plaintiff testified that he also has low back pain which he experiences when he stoops, bends, tries to put on his shoes, or gets dressed. Plaintiff testified that he sometimes wears a back brace. (Tr. 74.) Plaintiff testified that he was diagnosed with peripheral vascular arterial disease which caused numbness on his right side (Tr. 74, 77), and that he underwent femoral artery bypass surgery in July 2008 on both the right and left sides (Tr. 55). Plaintiff testified that he subsequently developed a bleeding ulcer on account of the medication, and that he had "ulcer claws" burned into his stomach. (Tr. 55.) Plaintiff testified that he also has carpal tunnel in both hands, but that his physicians told him to take care of one thing at a time, with his vascular condition being the most critical. (Tr. 75.) Plaintiff testified that he has

arthritis and that his hands swell and his fingers are painful on account of the condition. Plaintiff testified that he can sometimes use his hands to button and zip, but that he has trouble handling a knife. (Tr. 74-75.) Plaintiff testified that he has pain in his knees due to chondromalacia, and that he also has chronic gout. (Tr. 77.)

Plaintiff testified that he takes many medications. Specifically, plaintiff testified that he takes Hydrocodone Bitartrate every day for pain. Plaintiff testified that he experiences pain in his legs and arms which, he has been told, is caused by nerves. Plaintiff testified that the pain can range from a level three to an eight on a scale of one to ten, and that he has gone to the emergency room on occasion because of the pain. Plaintiff testified that the medication reduces his pain, but does not eliminate it. (Tr. 69.) Plaintiff testified that he takes Lisinopril which controls his high blood pressure. Plaintiff testified that he also takes Omeprazole which was given to him upon being diagnosed with a bleeding ulcer. (Tr. 70.) Plaintiff testified that he takes Gabapentin for nerve pain and Simvastatin for cholesterol. (Tr. 71.) Plaintiff testified that he takes Citalopram as prescribed by a psychiatrist, although he was uncertain as to the reason. (Tr. 71-72.)[1] Plaintiff testified

_____

[1]The ALJ referred to plaintiff as not having been prescribed medication for any psychiatric condition. Plaintiff expressed confusion as to the ALJ's characterization inasmuch as a psychiatrist had indeed prescribed medication for plaintiff, albeit

that although he experienced hallucinations with the medication, the psychiatrist increased the dosage. (Tr. 73.) Plaintiff testified that he takes Amitriptyline for sleep, as well as other medication for blood pressure and bowel control. (Tr. 72.) Plaintiff testified that he also takes Colchicine which provides some relief for his gout. (Tr. 77-78.)

Plaintiff testified that he has been told that he is depressed. Plaintiff testified that he sometimes cries and experiences panic/anxiety attacks. Plaintiff testified that he sees a psychiatrist at the Veterans Administration (VA) Medical Center, but does not know whether he takes medication for the condition. Plaintiff testified that he has had hallucinations, but was uncertain as to whether he ever attempted suicide. (Tr. 78-80.)

As to daily activities, plaintiff testified that he gets up in the morning at 9:00 or 10:00 a.m., at the latest. (Tr. 61.) Plaintiff testified that he watches television during the day and tries to exercise and stretch. Plaintiff testified that he walks as much as he is able, up to six house-lengths, but that he uses a cane or walker when doing so. Plaintiff testified that he sometimes reads. (Tr. 64.) Plaintiff testified that he sometimes sleeps in the afternoon because of taking a sleeping pill in the morning, as instructed by his doctor. (Tr. 65.) Plaintiff testified that he is trying to do more of his own cooking since he

for a reason unknown to plaintiff. (Tr. 94-95.)

has become more mobile, and that he is able to do prep work while sitting. (Tr. 61, 66.) Plaintiff testified that he does not do his own laundry because the laundry room is located on an upper floor of the house. Plaintiff testified that he has recently washed a few dishes. Plaintiff testified that he does not make his own bed or change his own bed linens, and was uncertain as to whether he was capable of doing such chores. (Tr. 61.) Plaintiff testified that he has not had to vacuum, sweep or mop, and was uncertain as to his capability to do so given his carpal tunnel condition. Plaintiff testified that he goes to the grocery store and rides in a "handicapped cart." (Tr. 62.) Plaintiff testified that he is no longer as sociable as he used to be, and that he does not want his friends to see him depressed. Plaintiff testified that his children would rather not talk to him because he depresses them. Plaintiff testified that he has a few friends who check on him or who ask family members how he is doing. Plaintiff testified that he believes he has overstayed his welcome with his sister and her family. (Tr. 63.) Plaintiff testified that he does not attend social events or have any hobbies. (Tr. 66-67.) Plaintiff testified that he has difficulty with showering and bathing because the facilities are located on the second floor, and because he has difficulty getting in and out of the tub. (Tr. 67.) Plaintiff testified that prior to his surgery in July 2008, he lived alone and took care of himself the best he could, including taking care

of the house, although minimally. (Tr. 76-77.) Plaintiff testified that he has a commercial driver's license, but has not used it in a few years. Plaintiff testified that he has been advised not to drive and has not driven since his most recent surgery in July 2008. (Tr. 49.)

As to his exertional abilities, plaintiff testified that his feet go numb if he sits too long. Plaintiff testified that his feet were currently going numb at the hearing. Plaintiff testified that he can walk for approximately twenty minutes. Plaintiff testified that he has difficulty lifting a gallon of milk and has difficulty opening things due to pain and swelling in his fingers, and pain in his arm and back. (Tr. 80-81.)

2. *Testimony of Plaintiff's Daughter*

Plaintiff's daughter, Stacia Holden, appeared at the hearing and testified in response to questions posed by the ALJ.

Ms. Holden testified that plaintiff is in a lot of pain, cries because his legs hurt, is emotionally "up and down," and calls her in the middle of the night because he cannot sleep. Ms. Holden testified that plaintiff has been in such condition since the beginning of the year. Ms. Holden testified that the July 2008 surgery did not seem to help. Ms. Holden testified that, although plaintiff lived by himself before his recent surgery, he always had friends or family with him. (Tr. 82-83.) Ms. Holden testified to her belief that plaintiff could not work because of his leg

condition.  (Tr. 84.)

Ms. Holden testified that plaintiff cries a lot and has been seeing a psychiatrist for years, although he had not been given any medication for depression.  Ms. Holden testified that she believed plaintiff to be depressed and that she tries to get him off of the telephone when he calls because he is so emotional.  Ms. Holden testified that she becomes depressed when she talks to plaintiff.  (Tr. 85.)

3.  *Testimony of Vocational Expert*

Susan Shea, a vocational expert, testified at the hearing in response to questions posed by the ALJ and by plaintiff.

Ms. Shea classified plaintiff's past work as an emissions tester as light and semi-skilled.  Ms. Shea classified plaintiff's past work as a corrections officer as medium and semi-skilled work as defined, but heavy work as performed by plaintiff.  Ms. Shea classified plaintiff's past work as a cook and bus driver as medium and semi-skilled, but testified that plaintiff performed his work as a bus driver at the light exertional level.  Finally, Ms. Shea classified plaintiff's past work as a stock clerk as heavy and semi-skilled.  (Tr. 88-89.)

The ALJ asked Ms. Shea to consider an individual of plaintiff's age, education and past work experience, and to further assume such an individual to be

capable of performing the exertional demands

> of light work, as defined in the Social
> Security regulations.  Specifically, the
> person can lift, carry, push, pull 20 pounds
> occasionally, ten pounds frequently.  Sit,
> stand, walk each six out of eight, for a total
> of eight out of eight.  The person would have
> only occasional use of the lower extremities
> for foot pedals and controls.  Occasion [sic]
> climb, stoop, kneel, crouch, crawl.
> Occasional ladders, ropes, or scaffolds, and
> avoid concentrated exposure to extreme cold,
> extreme heat, vibration, fumes, gasses,
> machinery, and heights.

(Tr. 89.)

Ms. Shea testified that such a person would be able to perform

plaintiff's past relevant work as an emissions tester and bus

driver.  (Tr. 89-90.)

The ALJ then asked Ms. Shea to assume an individual of

plaintiff's age, education and past work experience, and to further

assume such an individual to be

> capable of performing the exertional demands
> of sedentary work, as defined in Social
> Security regulations.  Specifically, the
> person could lift, carry, push, pull ten
> pounds occasionally, less than ten pounds
> frequently[.]  [S]it for six out of eight[;]
> stand, walk for two out of eight; for a total
> of eight out of eight[.]  [O]nly occasional
> use of the lower extremities for foot pedals
> and controls.  And, again, occasional climb,
> balance -- climb, stoop, kneel, crouch, crawl
> ladders, ropes, and scaffolds[;] and no
> concentrated exposure to extreme cold, extreme
> heat, vibration, fumes, gasses, machinery, and
> heights.

(Tr. 90.)

Ms. Shea testified that such restrictions would affect the performance of plaintiff's past relevant work and that there were no transferrable work skills. (Tr. 90.) Ms. Shea testified, however, that there was other work that such a person could perform, such as sedentary hand worker, of which 1,500 such jobs existed in the State of Missouri; machine tending/machine feeding types of positions, of which approximately 3,900 such jobs existed in the State of Missouri; and sedentary order clerk or election clerk, of which approximately 6,000 such jobs existed in the State of Missouri. (Tr. 91.)

Plaintiff asked Ms. Shea to consider whether a person with ongoing hallucinations could perform the work described, and Ms. Shea testified that such a person could not. (Tr. 92-93.)

B. Hearing Held May 27, 2009

1. *Plaintiff's Testimony*

Plaintiff was represented by counsel at the hearing on May 27, 2009, and testified in response to questions posed by him. At the outset of this hearing, plaintiff amended his alleged onset date of disability to June 21, 2007. (Tr. 27.)

Plaintiff testified that he was currently seeing Dr. Lomax, a psychiatrist, and had been seeing him since his surgery in July 2007. (Tr. 28.)[2] Plaintiff testified that he was unsure as

_____

[2]Plaintiff testified that he thought this vascular surgery occurred in July 2007. All evidence of record shows the surgery to have been performed in July 2008, as plaintiff testified at the

to what it meant to have depression, but alluded to having feelings of sadness and occasional difficulty remembering things. (Tr. 29-30.) Plaintiff testified as to having been lost, without knowing where he was at the time or where he was going. Plaintiff testified that he talks to Dr. Lomax about things that bother him, and that Dr. Lomax talks about plaintiff's father which plaintiff wishes he did not do. Plaintiff reported that he was just assigned to a new psychiatrist, but that he had not yet visited him. (Tr. 30.)

As to his physical conditions, plaintiff testified that he has "bad pains" in his feet, hip and knee when he walks, and that the pain travels to his calf and thigh if he continues to walk. Plaintiff testified that his lower extremities "shut down" and that he must stop and rest until feeling returns to his legs. Plaintiff testified that he experiences pain in his lower back, and that he sometimes feels as though he has been hit by a hammer in the low back when he stands. (Tr. 29.) It was noted that plaintiff used a cane at the hearing, and plaintiff testified that his doctor told him to use a cane. (Tr. 30.) Plaintiff testified that recent testing showed him to have carpal tunnel syndrome and that such condition causes pain in his hands, arms and upper back. Plaintiff testified that he cannot walk far if he is carrying

_____

previous hearing. In addition, as set out infra at Section III, the record shows plaintiff to have begun regular psychiatric treatment subsequent to this surgery in August 2008.

something in his hands due to pain in his back. Plaintiff testified that the pain travels to his hips and feet and that he must stop and rest. Plaintiff testified that he cannot walk nonstop from the parking lot at the VA Medical Center to the building, which plaintiff described to be a "pretty good distance[.]" (Tr. 31.)

    2.   *Testimony of Vocational Expert*

Mr. Dolan, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Dolan classified plaintiff's past work as an emissions tester as light and semi-skilled. Mr. Dolan classified plaintiff's past work as a corrections officer as medium and semi-skilled work as defined, but heavy work as performed by plaintiff. Mr. Dolan classified plaintiff's past work as a bus driver as medium and semi-skilled work. Mr. Dolan classified plaintiff's past work as a cook as medium and skilled. Finally, Mr. Dolan classified plaintiff's past work as a store's laborer and stock clerk as medium and unskilled. (Tr. 32.)

Counsel then asked Mr. Dolan to assume an individual of plaintiff's age, education and past relevant work, and to further assume that such a person had "moderate limitations in interacting appropriately with the public, supervisors, co-workers, also moderate limitations in the ability to respond appropriately to usual work situations and to changes in a routine work setting with

no physical limitations." (Tr. 33.)  Mr. Dolan said that such a person could perform plaintiff's past relevant work as a cook or store's laborer.  (Tr. 33.)

Counsel then asked Mr. Dolan to consider this same individual to further have

> physical limitations of being only able to lift occasionally up to ten pounds, carry occasionally up to ten pounds, sit during an eight-hour workday eight hours, stand two hours, walk one hour. . . . Would need a cane to ambulate, and without a cane would only be able to ambulate five to ten feet. . . . Occasionally handle, finger, and . . . push or pull with either hand.  Only occasionally operate foot controls with either foot.  Never stoop, never kneel, never crouch, never crawl, never climb stairs, or ramps, or ladders, or scaffolds.  Never be exposed to unprotected heights or moving mechanical parts, or operating a motor vehicle.  And he would . . . only be able to walk slowly at a reasonable pace on rough or uneven surfaces.

(Tr. 33-34.)

Mr. Dolan testified that the addition of such physical limitations would preclude performance of plaintiff's past relevant work and any competitive employment.  (Tr. 34.)

Counsel then asked Mr. Dolan to assume an individual who had been diagnosed with peripheral ischemic neuropathy, L4-L5 radiculopathy and degenerative disc disease, and that such an individual would be

> limited in balancing, even when standing or

>walking on level terrain due to his
>neuropathic pain. . . . [H]e should use a
>cane, [and] . . . in an eight-hour workday he
>would be expected to -- here he would be able
>to stand, walk, or sit for each of those 90
>minutes or less, and at one time without a
>break, sit, stand, or walk 15 to 30 minutes or
>less. Lift ten pounds occasionally, but carry
>less than that because of the compromise in
>his balance due to neuropathic pain. Stoop,
>crouch, crawl, climb ladders and scaffolds
>only rarely. Occasionally reach above the
>head. . . . Would experience pain frequently
>each day. Would need to take a nap or lie
>down during a normal eight-hour day due to
>pain, and would need breaks more frequently
>than every hour due to pain.

(Tr. 34-35.)

Mr. Dolan testified that such limitations would preclude

performance of plaintiff's past relevant work and any competitive

employment. (Tr. 35.)

The ALJ then asked Mr. Dolan to assume an individual of

plaintiff's age, education and past work experience, and to further

assume such an individual to be

>capable of performing exertional demands of
>sedentary work, as defined in the Social
>Security regulations, specifically to the
>person can lift, carry, push, pull ten pounds
>occasionally, less than ten pounds frequently.
>Sit for six out of eight, stand and walk for
>two out of eight, for a total of eight out of
>eight. Occasional use of the lower
>extremities with push for foot pedals.
>Occasional climb, stoop, crouch, kneel, or
>crawl. Occasional ladders, ropes, scaffolds.
>No moving machinery, unprotected heights,
>extreme cold, dust, fumes, gasses, vibration.
>And lastly, only occasional interaction with

supervisors, co-workers, and the public.
(Tr. 35-36.)

The ALJ stated that this hypothetical question was the same as that posed to the vocational expert at the hearing in November 2008, except that the instant hypothetical included a limitation regarding occasional interaction. Mr. Dolan here testified that the limitation to occasional interaction would not preclude the individual's performance of handwork/assembler or of machine tending. (Tr. 36.)

### III. Medical Records[3]

On June 8, 2000, plaintiff visited the emergency room at the VA Medical Center complaining of headaches related to hypertension. Plaintiff reported that he had not taken medication for the condition since October 1999. Plaintiff complained of numbness in his left leg and of occasional blurred vision in his left eye. Examination showed no leg edema or neurodeficit. A CT scan of the head yielded normal results. Plaintiff was given medication in the emergency room and was discharged home in

---

[3]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of a Mental Medical Source Statement dated June 12, 2009, from Dr. Karen S. Cowen. (Tr. 964-67.) The Court must consider this record in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of this record is incorporated with that of the records before the ALJ at the time of his decision.

improved condition.  (Tr. 566, 760-61.)

Plaintiff visited Dr. Gail L. Birkenmeier at the VA Medical Center on June 13, 2000, for follow up of his recent emergency room visit.  Plaintiff reported having no health insurance after having lost his job with the City the previous fall.  Plaintiff reported that he was diagnosed with hypertension when he was eighteen years of age, and that the condition was controlled in the past with medication.  Plaintiff's medical history was also noted to include arthroscopy to his right knee, chondromalacia,[4] sickle cell trait, and hyperlipidemia.  Plaintiff reported that he was currently stressed due to caring for his ill parents, including his father whom was bedbound due to Alzheimer's disease.  Dr. Birkenmeier ordered laboratory testing and plaintiff was referred for dietary consult.  Maxzide[5] was prescribed for plaintiff.  (Tr. 758-60.)

Plaintiff returned to Dr. Birkenmeier on August 3, 2000, for follow up.  Plaintiff reported continued stress in that his father recently passed away.  Plaintiff was noted to be tearful.  Plaintiff reported that he takes his medication regularly, although he felt he may have failed to take it for several days.  Plaintiff reported that he had not yet had his blood work done.  Plaintiff

---

[4]Softening of the cartilage.  Physicians' Desk Reference 332 (26th ed. 1995).

[5]Maxzide (HCTZ/Triamterene) is used to treat high blood pressure and edema.  Medline Plus (last revised July 1, 2010) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601125.html>.

reported that he was not sleeping well and that he was having some problems with his right shoulder. Dr. Birkenmeier noted plaintiff's hypertension to be elevated, but also that plaintiff was tearful and feeling very stressed. Dr. Birkenmeier offered grief counseling for plaintiff, but plaintiff stated that he did not want to return to Psychology. Plaintiff reported that he did not feel clinically depressed, and Dr. Birkenmeier shared the same opinion. As such, Dr. Birkenmeier determined not to prescribe any medication. Plaintiff was instructed to start Daypro[6] for his shoulder pain. (Tr. 757-58.)

Plaintiff visited the VA Medical Center on January 8, 2001, after having been assaulted by prisoners the day prior. Plaintiff reported his mouth, jaw, right shoulder, and right anterior chest to be sore. Swelling was noted about the face. Plaintiff was instructed to take Oxaprozin for pain. (Tr. 754-55.)

Plaintiff returned to Dr. Birkenmeier on April 5, 2001, for follow up. Plaintiff reported having run out of his blood pressure medication a few days prior. Dr. Birkenmeier noted plaintiff never to have completed his blood work. Plaintiff reported that he is on his feet a lot at work but does not exercise. It was noted that plaintiff worked two jobs. Plaintiff reported that he had decreased his alcohol intake due to lack of

_____

[6]Daypro (Oxaprozin) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last revised Dec. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601125.html>.

funds.  Plaintiff reported that he felt he was doing a little better with his grief.  Dr. Birkenmeier noted plaintiff's current blood pressure to be a little high and instructed plaintiff to get back on medication.  Plaintiff's medication for knee pain was changed to Feldene.[7]  Plaintiff was instructed to complete his laboratory testing.  (Tr. 751-52.)

On August 8, 2001, plaintiff visited Dr. Birkenmeier for follow up.  Dr. Birkenmeier noted plaintiff to be noncompliant with his blood pressure medication. Results from plaintiff's blood work were noted to be within normal limits.  Dr. Birkenmeier noted plaintiff to continue to struggle with his father's death which occurred one year prior.  It was noted that plaintiff worked for the State in emissions control and was trying to return to school for culinary arts.  Plaintiff was instructed to maintain an established routine for taking his blood pressure medication. Additional laboratory testing was ordered.  Plaintiff indicated that he had information regarding his dietary requirements and therefore was not interested in meeting with a dietician again. Plaintiff was encouraged to exercise.  (Tr. 749-50.)

Plaintiff went to the emergency room at the VA Medical Center on October 15, 2001, complaining of sharp pain in his left hip and both knees.  Plaintiff reported the pain to be at a level

_____

[7]Feldene is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last revised Jan. 1, 2011)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684045.html>.

eight on a scale of one to ten. Plaintiff reported experiencing similar pain in the past and that Feldene prescribed for the pain did not provide relief. Physical examination was unremarkable. Plaintiff was given Toradol[8] and was discharged in satisfactory condition. Upon discharge, plaintiff was prescribed Naproxen.[9] (Tr. 746-49.)

Plaintiff visited Dr. Birkenmeier on October 25, 2001, for follow up of his recent emergency room visit. Plaintiff reported his pain to have improved but that he continued to be in pain. Plaintiff reported that walking and standing exacerbated the pain. Plaintiff reported a history of chondromalacia and of having arthritis since he was a child. Plaintiff reported that he has problems with all of his joints. Plaintiff complained of pain in his hip and of having discomfort in his shoulders and right hand. Dr. Birkenmeier noted plaintiff to be tearful. Physical examination showed plaintiff to have full range of motion of his left knee, but with crepitus. Rotation of the left hip elicited pain. X-rays of the hip showed no fracture, dislocation, or arthritic changes. X-rays of the knees showed evidence suggestive of old trauma to the patellae bilaterally, as well as very mild

---

[8]Toradol is used to relieve moderately severe pain. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html>.

[9]Naproxen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Medline Plus (last revised Apr. 15, 2011) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681029.html>.

degenerative joint disease.  Plaintiff's medication was changed to Voltaren,[10] and plaintiff was instructed to also take Tylenol. Plaintiff was referred to physical therapy for therapy and possible injections.  (Tr. 564-65, 743-44.)

Plaintiff visited physical therapy at the VA on November 2, 2001.  Plaintiff reported his history of pain to include:  joint pain most of his life, problems with his knees as a teenager and being told that he had arthritis, being involved in a motor vehicle accident in the 1980's with subsequent physical therapy, injury in 1994 during a riot as a corrections officer, and worsening pain after a motor vehicle accident in 1999.  Plaintiff reported his pain to be exacerbated by walking, squatting, kneeling, and sitting too long.  Plaintiff also reported his symptoms to worsen with damp, cold weather.  Therapist Jacqueline Lamear noted plaintiff's gait to be slow with small steps.  Physical examination showed plaintiff's strength to essentially be within normal limits, and knee pain with range of motion.  Moderate tenderness was noted over the bilateral patellar tendons.  Plaintiff was instructed as to a home exercise program.  Plaintiff was to return for follow up in two weeks.  (Tr. 741-42.)

On November 19, 2001, plaintiff reported to Therapist

---

[10]Voltaren (Diclofenac) is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html>.

Lamear that there had been a difference in his hip pain, but that he continued to experience sharp pain in his knees with exercises. Plaintiff reported that he now had back and shoulder pain which was greater than his knee pain. Plaintiff reported his pain to be at a level seven. Range of motion of the back and knees was noted to be within normal limits, but with pain on rotation of the right knee. Plaintiff was prescribed additional home exercises and was instructed to return in two weeks. A consult for a knee brace was ordered. (Tr. 739-40.)

Plaintiff returned to physical therapy on December 3, 2001, and reported that the pain in his knees had not changed. Plaintiff also reported pain and swelling in his wrists and hands. Moderate tenderness over the bilateral patellar tendons and the right levator scapuli was noted. Plaintiff's grip strength was noted to be decreased in his left hand, but plaintiff demonstrated more force with putty exercises. Additional exercises were prescribed and plaintiff was instructed to return in two weeks for follow up. (Tr. 736-38.)

Plaintiff visited Dr. Birkenmeier on December 20, 2001, for follow up. Dr. Birkenmeier noted plaintiff's hypertension not to be controlled due to plaintiff's lack of compliance with his medication. Dr. Birkenmeier noted that plaintiff seemed to be doing better with his knee and hip pain after having been issued new braces. Plaintiff reported taking Extra Strength Tylenol and

Voltaren for pain. Plaintiff was prescribed a blood pressure monitor and was instructed to report the results in three to four weeks. (Tr. 735-36.)

Plaintiff returned to physical therapy on January 3, 2002. Plaintiff reported his knee pain to have improved with the knee braces and that his pain was currently at a level five. Physical examination showed significant crepitus bilaterally in the knees. Range of motion was normal but elicited pain on the right. Muscle tightness was also noted. Therapist Lamear noted plaintiff's improvement to be minimal. Plaintiff was instructed to continue with his home exercise program. Plaintiff was discharged from treatment that date, with Therapist Lamear opining that plaintiff had reached maximum potential. An orthopedic consult was recommended for plaintiff. (Tr. 733-35.)

Plaintiff returned to Dr. Birkenmeier on February 28, 2002, who noted the majority of the results obtained from plaintiff's blood pressure monitor to show good control. Plaintiff reported that he had been compliant with his medication. (Tr. 731-32.)

Plaintiff visited Dr. Birkenmeier on July 17, 2002, complaining of persistent pain in his left hip and knee. Plaintiff reported his pain to be at a level eight. Plaintiff reported that Diclofenac did not help the pain. Plaintiff reported continued pain regardless of position or activity. Plaintiff reported the

pain not to be in his muscles and that it did not radiate down his leg. Plaintiff reported being frustrated in that he takes his medication, does his stretching and is trying to lose weight, but that he was not getting better. Dr. Birkenmeier noted past lab results to show negative ANA, RF and a normal ERS. Dr. Birkenmeier also noted x-rays to show mild degenerative joint disease. Range of motion of the left hip elicited pain. Crepitus was noted upon range of motion of the left knee. Dr. Birkenmeier noted plaintiff to have failed conservative treatment but indicated that she did not know the etiology of plaintiff's pain. Plaintiff was referred to Rheumatology and Orthopedics. Dr. Birkenmeier noted plaintiff to be tearful. Plaintiff reported that he felt he was not in control and that he was frustrated by not knowing what was wrong with him. Dr. Birkenmeier recommended that plaintiff see someone in Psychology or speak with a social worker, but plaintiff declined. (Tr. 727-29.)

Plaintiff returned to Dr. Birkenmeier on September 28, 2002, and reported that Hydrocodone helped to make the pain more tolerable. Dr. Birkenmeier questioned whether plaintiff suffered from depression. Plaintiff reported his mood to be better and that he was back in school and was working. Plaintiff reported that he was compliant with his blood pressure medication. Physical examination was unremarkable. Dr. Birkenmeier noted plaintiff to have an appointment with Rheumatology in one month. Plaintiff was

instructed to return for follow up with Dr. Birkenmeier in four months. (Tr. 725-27.)

Plaintiff visited Rheumatology at the VA Medical Center on October 17, 2002. Plaintiff reported a twenty-year history of polyarthralgias with slow and persistent progression of symptoms. Plaintiff reported the most symptomatic areas to be both knees and the left hip/groin area, but also that he experienced bothersome aches in his wrists, elbows and shoulders. Plaintiff reported taking Tylenol with minimal relief. Physical examination was remarkably normal. Plaintiff had full range of motion of the upper extremity joints. Examination of the left knee, left groin and left hip elicited pain. The right knee was normal. Plaintiff had no positive results at any of the eighteen fibromyalgia tender points. Laboratory testing showed positive ANA results. X-rays showed the left hip to be normal. X-rays of the knees showed separated, calcified fragments along the lateral aspect of the patellae, with mild degenerative joint disease. Based on the result of the examination and diagnostic testing, it was determined that a diagnosis or recommended treatment could not be made. It was opined that plaintiff did not have inflammatory arthritis. It was recommended that plaintiff maintain current supportive care. Plaintiff was instructed to return in one year. (Tr. 724-25.)

Plaintiff returned to Dr. Birkenmeier on January 3, 2003, and reported that he sometimes experienced joint pain. Plaintiff

reported not having taken his blood pressure medication during the past several days. Good control of plaintiff's hypertension was discussed. (Tr. 222-24.)

Plaintiff visited Dr. Birkenmeier on May 27, 2003, and reported that difficulty with his joint pain recently increased with the cooler, rainy weather. Plaintiff reported his left heel to be especially painful and that his right shoulder had become bothersome. Plaintiff stated that he had begun some old physical therapy exercises for more relief. Plaintiff also complained of continued swelling and numbness in both hands, but reported that his knees and hips were feeling better. With regard to his spirits, plaintiff stated that he was doing well. Plaintiff's medications were noted to be Ibuprofen, Tylenol #3, Indocin,[11] and HCTZ/Triamterene. Physical examination was unremarkable. Dr. Birkenmeier changed plaintiff's blood pressure medication to HCTZ/Irbesartan.[12] Dr. Birkenmeier noted there to be an osteoarthritis component of plaintiff's pain and instructed him to continue with his medication and home exercises. (Tr. 719-21.)

Plaintiff called the VA Medical Center on June 5, 2003,

_____

[11]Indocin (Indomethacin) is used to relieve moderate to severe pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis and ankylosing spondylitis. <u>Medline Plus</u> (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a681027.html>.

[12]The combination of Irbesartan and Hydrochlorothiazide is used to treat high blood pressure. <u>Medline Plus</u> (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602003.ht ml>.

with complaints of back pain after having moved heavy furniture. Recommendations for treatment were provided. (Tr. 718-19.)

Plaintiff visited Urgent Care at the VA Medical Center on July 31, 2003, complaining of recent onset of left foot pain at a level ten. X-rays of the foot showed minimal hallux valgus, but no evidence of fracture, dislocation or other bone or joint pathology. Upon examination, plaintiff was diagnosed as having a gout attack of the left foot, and Toradol was administered. Plaintiff was prescribed Colchicine[13] for the condition. (Tr. 564, 716-18.)

On October 28, 2003, Dr. Birkenmeier noted plaintiff not to have appeared for two scheduled appointments. (Tr. 716.)

On October 28, 2003, plaintiff returned to Rheumatology who continued to note the etiology of plaintiff's polyarthralgias to remain unclear. Plaintiff reported that he was doing "okay," continued to experience pain, but that it was not any worse. No diagnoses or treatment recommendations were given. (Tr. 715-16.)

On November 20, 2003, Dr. Birkenmeier noted plaintiff not to be compliant with his blood pressure medication. (Tr. 714.)

Plaintiff visited Dr. Birkenmeier on October 27, 2004. Dr. Birkenmeier noted plaintiff to have failed to appear at multiple scheduled appointments since May 2003. Plaintiff reported having attended school, participated in a fitness class, and engaged in

_____

[13]Colchicine is used to prevent gout attacks and to relieve the pain of gout attacks when they occur. Medline Plus (last revised Feb. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682711.html>.

aerobics and weight training.  Plaintiff complained of pain in his lower extremities and joints, and reported that he took Naproxen for the pain.  Plaintiff reported his current level of pain to be at a level seven.  It was noted that plaintiff was no longer taking blood pressure medication, and he was instructed to start Irbesartan. Plaintiff reported experiencing diarrhea with his gout medication. As to his joint pain, plaintiff reported trying over-the-counter glucosamine and a trial of Etodolac.[14]  Plaintiff was given instruction on exercise and weight loss, and it was recommended that he participate in physical therapy.  (Tr. 711-14.)

On December 16, 2004, plaintiff called the VA Medical Center and reported complaints of burning sensations in his feet and thighs when walking up stairs; daily pain in his feet; pain in his feet, right hip and knee when walking; occasional pain in his legs when walking up stairs; swelling and pain in his left knee when walking up stairs; pain in his thighs when trying to run; pain in his right finger; numbness in both hands; pain in both feet when standing; and intermittent throbbing and pulsation in his legs. Plaintiff reported that he stopped taking Etodolac two weeks prior because it made him feel bad, and that he felt better since stopping the medication.  (Tr. 710-11.)

On January 6, 2005, plaintiff called the VA Medical Center

---

[14]Etodolac is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692015.html>.

and requested a replacement medication for pain since he had stopped taking Etodolac. Ultram[15] was prescribed. (Tr. 710.)

Plaintiff visited Dr. Birkenmeier on February 17, 2005, and complained of arthralgias in his lower extremities and foot pain after standing for a long period of time. Dr. Birkenmeier noted plaintiff to be working full time and attending school. Plaintiff's blood pressure readings taken at home were noted to be variable. Plaintiff was instructed as to weight control and exercise. Depression screening was negative. Dr. Birkenmeier diagnosed plaintiff with controlled hypertension, arthralgias, and hyperlipidemia. Plaintiff was referred to Podiatry regarding his complaints of foot pain. (Tr. 707-08.)

Plaintiff underwent a consult with Podiatry on May 5, 2005, and reported numbness, tingling and burning sensations in his feet after prolonged walking and carrying heavy objects. Upon physical examination, plaintiff was diagnosed with neuralgia and flat feet. Shoe inserts were ordered. (Tr. 705-06.)

Plaintiff returned to Dr. Birkenmeier on June 9, 2005, and complained of pain in his knees and right hip, and of pain and weakness in his right hand. Plaintiff also complained of pain and discomfort in his feet and toes. Plaintiff reported that shoe inserts helped only a little. Plaintiff reported that coldness,

---

[15]Ultram (Tramadol) is used to relieve moderate to moderately severe pain. <u>Medline Plus</u> (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695011.html>.

walking and standing exacerbated his symptoms. Plaintiff was noted to be limping. Dr. Birkenmeier noted plaintiff's blood pressure to be excellent and determined the condition to be controlled. Plaintiff reported being on his feet a lot at work and of continuing to be in school. It was noted that plaintiff's ill mother was living with him. Plaintiff was given Ultram for pain and was instructed to take Tylenol as well. It was recommended that plaintiff return to Podiatry for possible orthotics. (Tr. 704-05.)

Plaintiff visited an occupational therapist at the VA Medical Center on June 30, 2005, in relation to his complaints of pain in his right wrist. Examination showed plaintiff to have decreased grip and pinch strength in both his right and left hands. Tinel's test and Phalen's test were negative. Plaintiff was diagnosed with tenosynovitis of the hand and wrist and was provided a splint for his right wrist. (Tr. 701-02.)

Plaintiff visited the emergency room at the VA Medical Center on July 7, 2005, with complaints of being unable to function because of increased pain in his right knee. Plaintiff reported that his knee popped and gave way with weight bearing, and that he was currently unable to straighten it. Plaintiff reported that Tramadol and Ibuprofen did not provide relief. X-rays of the knee showed no change since October 2001. Plaintiff was given an injection of Toradol and was discharged in satisfactory condition. Plaintiff was instructed to obtain an orthopedic consult from his

primary care physician. Plaintiff was diagnosed with degenerative joint disease of the knee and was prescribed Tylenol #3 upon discharge. (Tr. 563, 697-701.)

On July 12, 2005, the VA advised plaintiff that he would be referred to physical therapy for his knee condition inasmuch as films did not reveal a surgical problem. (Tr. 696.)

Plaintiff returned to Podiatry on October 21, 2005, for routine care. X-rays of the foot yielded normal results. The Prosthetics Department was to be consulted for shoes and inserts. Surgery to the left foot was discussed for bunion removal. Surgery to the right foot was discussed for fifth metatarsal osteotomy. (Tr. 562, 691-92.)

Plaintiff visited Dr. Birkenmeier on December 14, 2005, and reported that he continued to have problems with foot pain and was considering surgery. Dr. Birkenmeier noted plaintiff's only medication to be Motrin. Restarting Ultram and Tylenol was discussed. It was noted that plaintiff ran out of his blood pressure medication three months prior. Dr. Birkenmeier considered plaintiff's hypertension to be uncontrolled. Dr. Birkenmeier noted that Podiatry would refill plaintiff's pain medication. (Tr. 687-90.)

On January 17, 2006, Dr. Birkenmeier noted plaintiff's blood pressure to have improved. Plaintiff continued to complain of foot problems and reported that he took Extra Strength Tylenol

and Tramadol for the condition. Plaintiff reported that his medication made him drowsy. It was noted that plaintiff was to schedule surgery for his foot pain, but that his blood pressure needed better control. Dr. Birkenmeier adjusted plaintiff's blood pressure medication. (Tr. 685-87.)

On February 7, 2006, plaintiff reported to Outpatient at the VA Medical Center and complained of severe, chronic pain in his feet and legs. Plaintiff also reported headaches and eye pressure associated with his high blood pressure readings. It was noted that plaintiff stretched for exercise, but otherwise was unable to exercise due to pain in his feet and legs. Plaintiff's current medications were noted to be acetaminophen, Losartan[16] and Tramadol. It was noted that plaintiff was currently on the maximum dose available for his blood pressure medication, and additional blood pressure medication, Felodipine,[17] was prescribed. Plaintiff also reported increased stress with resulting memory loss. Plaintiff reported that he cared for his mother on a daily basis, which included cooking, cleaning, maintaining her medications, etc. It was noted that plaintiff cried when discussing all of the things he had going on. When medication and a support group were recommended to help plaintiff with his stress, plaintiff became more upset and

---

[16]Losartan is used to treat high blood pressure. _Medline Plus_ (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a695008.html>.

[17]_See_ _Medline Plus_ (last revised Oct. 1, 2010)<http:// www.nlm.nih.gov/medlineplus/druginfo/meds/a695008.html>.

said that he did not have time and did not "want to be a zombie[.]"
Dr. Birkenmeier was advised of plaintiff's depressive symptoms and
plaintiff's resistence to treatment therefor. (Tr. 681-85.)

On March 9, 2006, plaintiff reported to Outpatient that
he was feeling great and with better control of his pain. It was
noted that plaintiff's Felodipine was switched to Atenolol[18] due to
adverse reaction. (Tr. 676-77.)

On March 18, 2006, plaintiff reported to the VA Medical
Center that he experienced a flare up of gout with severe pain in
his right foot. It was noted that plaintiff recently began taking
Atenolol. Plaintiff reported that he would continue with his blood
pressure medication. (Tr. 675.)

On March 28, 2006, plaintiff complained to Outpatient that
he was experiencing intense leg pain and reported the pain in his
leg and foot to have increased since he began taking Atenolol.
Plaintiff reported that he decreased his dosage of the medication,
but that the severe pain continued. It was noted that the Atenolol
was not likely contributing to plaintiff's leg pain. A new
prescription was provided to plaintiff. (Tr. 668-71, 677.)

On March 29 and April 5, 2006, plaintiff called the VA
Medical Center with complaints of continued pain and numbness in his
feet and legs. Plaintiff was instructed to keep his appointment

---

[18]Atenolol is used to treat high blood pressure. <u>Medline Plus</u>
(last revised July 1, 2010)<<u>http://www.nlm.nih.gov/medlineplus/</u>
druginfo/meds/a684031.html>.

with Podiatry.  (Tr. 666-67.)

On April 21, 2006, plaintiff visited Podiatry who noted there to be no changes from the last visit.  It was noted that surgery could not be conducted until plaintiff obtained medical clearance regarding his hypertension.  (Tr. 665-66.)

Plaintiff returned to Outpatient on April 25, 2006, for blood pressure monitoring.  Plaintiff continued to complain of pain and a burning sensation in his right foot and toes.  Plaintiff also reported sporadic symptoms of fatigue with Metoprolol.[19]  Plaintiff reported being unable to exercise due to foot pain.  It was noted that plaintiff had reached his goal with his blood pressure readings.  Plaintiff was instructed to continue with his medications and to return in two months for follow up.  (Tr. 661-64.)

Plaintiff visited Dr. Birkenmeier on June 26, 2006, and complained of pain in his right foot from his ankle to his toes. Plaintiff reported that Tylenol and Tramadol did not help.  Dr. Birkenmeier noted plaintiff to be walking with a cane.  Physical examination showed no warmth or swelling, but tenderness was noted with palpation over the lateral malleolus with discomfort on flexion.  Plaintiff described the pain to be at a level nine, and plaintiff was observed to limp.  Dr. Birkenmeier noted the etiology of plaintiff's complaints to be unclear inasmuch as the examination

---

[19]Metoprolol is used to treat high blood pressure.  Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a682864.html>.

was inconsistent with gout or fracture. Plaintiff was administered Toradol and was given Indocin with instruction as to rest, elevation and applying ice to the affected area. Plaintiff's hypertension was noted to be uncontrolled given plaintiff's noncompliance with his medication. Finally, plaintiff reported that he was under a lot of stress in that his mother was ill and hospitalized, he was trying to care for his family, he was no longer working, and he was trying to look for work. Depression screening yielded negative results. (Tr. 653-56.)

Plaintiff returned to the VA Medical Center on September 12, 2006, for a blood pressure evaluation. Plaintiff reported that he experienced joint pain in his lower leg, but that he did not know the cause of it. Plaintiff reported having many difficulties with finances in that, although working full time, he was providing extensive care for his mother and his medications were expensive. It was recommended that plaintiff undergo a pain evaluation and contact a social worker regarding his finance issues. (Tr. 650-51.)

Plaintiff called Social Worker Outpatient at the VA Medical Center on December 6, 2006, requesting hardship assistance regarding payment for his medication refills. Plaintiff reported that he takes care of his mother and seldom works a full week. (Tr. 649-50.)

Plaintiff visited Dr. Birkenmeier on December 26, 2006, and complained of shooting and cramping pain in his right calf and

hip and that he sometimes did not have use of his right leg. Plaintiff reported the pain to worsen with exertion such as walking up a hill or over a distance. It was noted that plaintiff's blood pressure was running high and it appeared that plaintiff was not taking his medication as directed. Plaintiff reported having difficulty with bills. Plaintiff was instructed to comply with his medication regimen. Physical examination showed decreased pulses peripherally with bilateral bruits in plaintiff's femoral arteries. Plaintiff was given instruction and encouragement as to exercise. It was noted that the MOVE program would not be appropriate for plaintiff due to his "poor life expectancy, serious health care issues, or other impairments." An ultrasound of plaintiff's abdomen was negative. A vascular study was scheduled for April 2007. (Tr. 646-49.)

Plaintiff underwent ultrasound testing on January 23, 2007, in response to his history of bruits in his abdomen and femoral arteries. The results showed no sonographic evidence of abdominal aortic aneurysm. (Tr. 561-62.)

Plaintiff visited Outpatient on January 25, 2007, for follow up of his hypertension. Plaintiff's condition was noted to be uncontrolled. Plaintiff spoke at length regarding his difficulties with the VA and with trusting VA providers. Plaintiff reported being exhausted with working and with taking care of his mother, and that he had problems with medication compliance on

account of it.  Plaintiff denied headache, vision loss, agitation, confusion, shortness of breath, or palpitations.  Plaintiff complained of tingling and numbness, especially in his right leg when walking on inclines.  Plaintiff also complained of fatigue and urinary urgency.  It was noted that plaintiff's current medications included Diltiazem,[20] Losartan, Metoprolol, and Pentoxifylline.[21] Plaintiff was instructed to continue with his current medications.  (Tr. 642-46.)

On February 6, 2007, plaintiff called Outpatient and reported that he was out of pain medication because he finished it the previous night due to burning sensations in his right foot and calf.  Dr. Birkenmeier was contacted and she determined to renew plaintiff's Tramadol.  Dr. Birkenmeier also prescribed Elavil[22] for plaintiff to take at night.  (Tr. 642.)

Plaintiff visited Podiatry on February 26, 2007, and complained of difficulty sleeping at night due to burning sensations in the right leg, toes and knee.  Plaintiff reported pain

---

[20]Diltiazem is used to treat high blood pressure.  Medline Plus (last revised July 1, 2010)<http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a684027.html>.

[21]Pentoxifylline is used to improve blood flow in patients with circulation problems to reduce aching, cramping, and tiredness in the hands and feet.  Medline Plus (last reviewed Sept. 1, 2008) <http://www.nlm.nih.gov/medlineplus/druginfo/meds/a685027.html>.

[22]Elavil (Amitriptyline) is used to treat depression and post-herpetic neuralgia.  Medline Plus (last revised Aug. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682388.ht ml>.

particularly at the lateral malleolus to the right ankle, and that the pain had been most noticeable during the previous two years. Plaintiff reported that he could not sleep without taking pain medication. Plaintiff reported not being able to walk several blocks without stopping to rest. Physical examination was unchanged from the last visit. Surgery for bunion correction on the right foot was put on hold given the pain and cramping in plaintiff's right leg. (Tr. 638-41.)

X-rays taken of plaintiff's right ankle on March 2, 2007, yielded negative results except for a small spur at the Achilles insertion. X-rays taken of plaintiff's right foot showed evidence of moderate hallux valgus. X-rays of the right tibia and fibula showed mild osteophytic spurring at the knee, consistent with mild degenerative change. (Tr. 558-61.)

Plaintiff returned to the VA Medical Center on March 7, 2007, for follow up of his hypertension. It was noted that plaintiff was compliant with his medication and had met his blood pressure reading goals. It was noted that plaintiff had extensive complaints regarding severe pain on his right side, especially in his feet, and that such pain moves up his body to his calves, knees and hips when he walks. Plaintiff reported this to have been an ongoing problem for many years. Plaintiff reported that regularly taking Tramadol somewhat relieved his pain. Plaintiff reported that he was recently prescribed Amitriptyline by his primary care

physician and was concerned because it was a medication used to treat depression. Plaintiff stated that he thought his physician was treating his mind instead of the true problem. Plaintiff was instructed to continue on his current medications. (Tr. 636-38.)

Plaintiff began seeing a new primary care physician at the VA Medical Center on March 29, 2007. Dr. Gina L. Michael reviewed plaintiff's medical history. Plaintiff reported having experienced his right knee problems for two years and that currently the pain starts in the lateral aspect of his right foot when he walks, travels up his lower leg to his knee, and then to his hip. Plaintiff reported the pain to feel like a cramp in his calf, and that it has a duration of about two hours. Plaintiff reported the onset of pain with activity and that he experiences such pain almost daily. Plaintiff also reported the pain to prevent him from lying down. Plaintiff reported having no back pain. Dr. Michael noted plaintiff's current medications to be Diltiazem and Metoprolol. Examination of plaintiff's extremities showed no edema and full range of motion of the knees and hips. Dr. Michael diagnosed plaintiff with right lower extremity pain, etiology unclear; uncontrolled hypertension; and right bunion, callous. Laboratory testing, an EMG and x-rays were ordered. Plaintiff was instructed to increase his dosage of Metoprolol and to finish Losartan. Plaintiff was instructed to return in four months. (Tr. 630-36.)

X-rays taken of plaintiff's right hip and lumbosacral

spine on March 29, 2007, were normal.  (Tr. 556-57.)

On April 5, 2007, plaintiff underwent vascular studies which showed severe arterial insufficiency at the ankle level in the right leg.  Moderate arterial insufficiency was noted in the left leg at rest.  (Tr. 630.)

Plaintiff visited the emergency room at the VA Medical Center on May 28, 2007, and reported that he had been involved in an accident with a motor vehicle the previous night with direct trauma to his right hip and leg.  Plaintiff was able to walk with a cane, but with pain.  Examination of the back showed tenderness and spasms.  Minimal tenderness was noted about the right hip area with full range of motion.  X-rays of the area were negative. Plaintiff was given Tylenol #3 and Flexeril[23] upon discharge.  (Tr. 550-55, 627-30.)

Plaintiff called the VA Medical Center on June 4, 2007, and complained of pain in his back, at the base of his neck, and in his lower shoulder.  Plaintiff reported that the medication given him the previous week "knock[ed] him out," and he requested additional evaluation.  Plaintiff was instructed to go to the emergency room and/or the clinic for further evaluation.  (Tr. 625-26.)

Results of EMG/nerve conduction studies were obtained on

---

[23]Flexeril is a muscle relaxant used to relax muscles and relieve pain and discomfort caused by strains, sprains and other muscle injuries.  Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682514.html>.

June 4, 2007, and showed right L5-S1 radiculopathy and bilateral medial nerve entrapment at flexor retinaculum, i.e., carpal tunnel syndrome. (Tr. 624-25.)

Plaintiff went to the Clinic at the VA Medical Center on June 5, 2007, and complained of worsening right lower back pain and muscle spasm about the left upper back. It was noted that plaintiff walked with a cane. Tenderness to palpation was noted about the left trapezius, the left tenth rib, and the right lower back at the L4 level. Range of motion was intact. Plaintiff was instructed to take Ibuprofen and to continue with Flexeril. Plaintiff was instructed to take Tylenol #3 for breakthrough pain. Plaintiff was instructed as to exercise and stretching. Physical therapy was offered, but plaintiff declined. (Tr. 621-24.)

Plaintiff visited Dr. Marc C. Hubbard from Euclid Chiropractic Centre on June 11, 2007, in relation to his injury suffered in May 2007. (Tr. 272, 275.) Plaintiff reported that he was struck by a motor vehicle on the parking lot of his workplace, and that he experienced stiffness and sharp, shooting pain as a result. Plaintiff reported the pain to be exacerbated with walking and traversing steps. (Tr. 282.) Dr. Hubbard noted plaintiff to be taking Tramadol and Ibuprofen for pain. Plaintiff reported that during his teenage years, he was diagnosed with possible mild rheumatoid arthritis in the knee. Plaintiff reported having suffered a knee injury in 1984 while in the military. Plaintiff

also reported having suffered a knee injury in 1994. (Tr. 281.)
Dr. Hubbard implemented a plan for treatment, which included visits
five times during the first week of treatment, with three visits per
week thereafter for two additional weeks. (Tr. 275.)

X-rays taken of plaintiff's cervical spine on June 11,
2007, showed uncovertebral arthrosis which may have resulted in some
degree of IVF encroachment; spondylosis at the C4 and C5 disc
levels; and rotational malposition of the C2. X-rays taken that
same date of the lumbar spine showed facet arthrosis at the L2-L3,
L3-L4, L4-L5, and L5-S1 levels; and spondylosis at the L3, L4 and
L5 disc levels. (Tr. 276.)

Plaintiff returned to Dr. Hubbard on June 12, 2007, and
complained of intermittent headaches, neck pain and stiffness,
muscle soreness, upper back pain and muscle spasms, pain radiating
in the lumbar spine, and low back soreness. Examination showed
tenderness about the splenius capitis, trapezius, rhomboid, and
erector spinae muscles. Range of motion about the lumbar spine was
noted to be restricted. (Tr. 272.)

On June 13, 2007, plaintiff continued to complain of pain
to Dr. Hubbard and rated his pain at a level seven. Examination
continued to show tenderness. Dr. Hubbard noted plaintiff's
trapezius, rhomboid and erector spinae muscles to be hypertonic.
Plaintiff was instructed to continue with care. (Tr. 273.)

On June 14, 2007, Dr. Hubbard noted plaintiff's subjective

complaints not to have changed. Tenderness and hypertonic muscles continued to be present. Plaintiff was instructed to continue with care. (Tr. 273.)

On June 15, 2007, plaintiff returned to Dr. Hubbard and complained of neck pain during motion; neck stiffness; muscle soreness/achiness; pain radiating across the shoulders; upper back muscle soreness, stiffness and tightness; low back pain, soreness and stiffness; and achiness and discomfort in the low back. Plaintiff rated his pain to be at a level six. Dr. Hubbard continued to find tenderness and hypertonic muscles. Dr. Hubbard noted plaintiff to have improved slightly since his last visit. Plaintiff was instructed to continue with care. (Tr. 274.)

In a note dated July 2, 2007, Dr. Hubbard's office noted plaintiff to have missed several appointments. (Tr. 274.)

Plaintiff visited Dr. Michael at the VA Medical Center on July 5, 2007, for follow up of his conditions. Plaintiff reported continued pain in his hips and muscle pain in his left thigh, with no relief obtained from medication. Dr. Michael noted the results of plaintiff's diagnostic testing. Dr. Michael ordered an MRI of the lumbar spine and referred plaintiff to Vascular Surgery for evaluation. Plaintiff was prescribed various medications, including

HCTZ, Nifedipine[24] and Pletal.[25]   It was noted that depression screening yielded positive results, with plaintiff reporting having little interest or pleasure in doing things, and feeling down, depressed or hopeless nearly every day.  (Tr. 617-21.)

On July 13, 2007, plaintiff was examined by Dr. Andrew M. Wayne at Orthopedic & Sports Medicine in relation to his work injury.  Plaintiff reported that he was struck by a vehicle and was impacted in the right hip and buttock region.  Plaintiff reported immediate pain to the region as well as in the pelvic region and low back.  Plaintiff reported that the pain went down his right leg and that he subsequently noticed it going down his left leg.  Plaintiff reported that he began to experience neck pain, a "crawling" feeling in his right elbow region, and a knot in the right upper back. Plaintiff reported that he obtained minimal benefit with chiropractic treatment, and subsequently underwent physical therapy which worsened his condition.  (Tr. 291.)  Dr. Wayne reviewed the June 11, 2007, x-rays and opined that they showed no acute abnormalities but only very early degenerative changes.  Plaintiff denied having any prior injuries to the affected areas.  Plaintiff

_____

[24]Nifedipine is used to treat high blood pressure.  Medline Plus (last revised Nov. 1, 2010)<http://www.nlm.nih.gov/ medlineplus/druginfo/meds/a684028.html>.

[25]Pletal is used to reduce the symptoms of intermittent claudication (pain in the legs that worsens when walking and improves when resting that is caused by narrowing of the blood vessels that supply blood to the legs).  Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a601038.html>.

reported being in good health other than a history of hypertension. Dr. Wayne noted plaintiff's current medications to include Ibuprofen, Metoprolol, Flexeril, and Ultram. Plaintiff reported mild improvement with medications. It was noted that plaintiff lived with and helped care for his eighty-four-year-old mother. Plaintiff worked less than twenty hours a week at a convenience mart, but worked full duty. Dr. Wayne noted plaintiff to report musculoskeletal complaints with the hip, right back and buttock, as well as the neck; and right upper extremity complaints with periodic lower extremity complaints bilaterally. Plaintiff reported having some depression, numbness, weakness, hypertension, hoarseness, visual changes, itching, dizziness, lumps, and weight change. (Tr. 292.) Physical examination showed limited range of motion with pain about the back and hips. Tenderness was noted about the left upper trapezius, left cervicothoracic junction, right lateral hip, right upper lateral gluteal region, and right lumbosacral region. No muscle spasms were noted in any of the areas. No focal weakness was noted about the lower extremities. Sensory examination was normal about the upper and lower extremities, bilaterally. Upon conclusion of the examination, Dr. Wayne diagnosed plaintiff with status post contusion/strain to the right lumbosacral/gluteal and lateral hip distribution. X-rays taken in the office that date showed no acute abnormalities and no significant degenerative changes in the right or left hip. Dr. Wayne also opined that plaintiff suffered a left

cervicothoracic strain which was relatively minor compared to his other symptoms. Dr. Wayne recommended that plaintiff participate in physical therapy for two weeks. Plaintiff was instructed to continue with Ultram, and Relafen[26] was added to his medication regimen. Dr. Wayne instructed that plaintiff be limited to light duty with no lifting over twenty pounds, no climbing ladders, no repeated bending, and alternate sit/stand when needed. Plaintiff was instructed to return in two weeks for follow up. (Tr. 293.)

The results of an MRI of plaintiff's lumbar spine on July 16, 2007, showed mild left paracentral disc bulge with a mild narrowing of the left lateral recess at L4-L5. (Tr. 548-50.)

Plaintiff returned to Dr. Wayne on July 24, 2007, and reported definite progress with physical therapy regarding his neck, but only mild improvement with continued pain in the right gluteal and hip areas. Plaintiff reported temporary improvement of his symptoms with medication, but that he felt a pinching sensation in the right hip and buttock region with increased activity, such as attempting the treadmill, and with stretching and therapy. Physical examination showed normal range of motion about the neck. Range of motion exercises about the lumbosacral region elicited mild pain in the right lateral hip and buttock area. Tenderness was also noted in the area. Tenderness was noted in the left cervicothoracic

---

[26]Relafen is used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis and rheumatoid arthritis. Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692022.html>.

junction with mild increased muscle tone in the region. Straight leg raising on the right caused a mild pulling sensation in the gluteal region. Range of motion of the right hip was mildly limited. Mild right hip pain was present with squatting. Dr. Wayne noted plaintiff's gait to be slightly slow but non-antalgic. (Tr. 289.) Dr. Wayne diagnosed plaintiff with status post right lateral hip/gluteal strain/contusion, status post right lumbosacral strain, and left cervicothoracic strain. Dr. Wayne opined that plaintiff was making some significant progress but continued to have persistent symptoms about the right gluteal/lateral hip distribution. Dr. Wayne noted plaintiff's complaints of a pinching sensation to be compatible with a labral tear in the hip. It was determined that plaintiff would continue with physical therapy. Dr. Wayne recommended imaging testing of the area if significant improvement of the symptoms did not occur. Plaintiff was instructed to continue on his current medications and to continue with restrictions to light duty at work, with a lifting limit increased to twenty-five pounds. (Tr. 290.)

Plaintiff's file with Dr. Hubbard's office was closed on August 6, 2007, after numerous unsuccessful attempts to contact plaintiff. (Tr. 274.)

Plaintiff returned to Dr. Wayne on August 10, 2007, who noted there to be considerable progress with respect to plaintiff's right hip, neck and low back. Dr. Wayne noted that plaintiff shared

with the physical therapist that he had a pre-existing knee condition and that the pain in his right knee was worsening with treatment for his work-related injuries. It was noted that plaintiff's underlying knee problems were his biggest complaint at the moment. Plaintiff reported taking Ultram and Ibuprofen on a daily basis, primarily for his knee. Physical examination showed no significant right hip or sacral pain with passive rotation. No tenderness was noted about the area. A partial squat elicited pain in the right knee, but no other complaints of pain were noted. Tenderness and crepitus were noted about the right knee with passive range of motion. Range of motion about the knee was limited. Range of motion about the lumbosacral region was normal. (Tr. 287-88.) Dr. Wayne diagnosed plaintiff with status post right lateral hip/ gluteal strain/contusion, noting that such condition had markedly improved with plaintiff expressing some ongoing symptoms but was very comfortable with his home exercise and stretching program. Dr. Wayne also diagnosed plaintiff with status post right lumbosacral strain and status post left cervicothoracic strain, noting such conditions to have improved greatly. Dr. Wayne opined that plaintiff's right knee pain was a chronic, pre-existing condition which had worsened since this injury, but that the prevailing aspect of the pain was the pre-injury condition of the knee. Dr. Wayne concluded that plaintiff was at maximal medical improvement regarding his injuries sustained at work, but that plaintiff may

want to obtain a new knee brace for his right knee. Dr. Wayne released plaintiff to full duty at work without any restrictions and noted that if any restrictions were needed on account of the condition of the right knee, any such restrictions would not be due to work-related injury. (Tr. 288.)

Plaintiff visited Vascular Surgery at the VA Medical Center on August 16, 2007, for consultation. Plaintiff reported having pain in his right leg and calf after walking one to two blocks. Plaintiff reported cramping in the calf after walking a short distance, and that pain radiates from his ankle to mid-thigh. Physical examination showed diminished pulses over the right popliteal and right DP. Pulses were okay over the left groin. Atrophy was noted in the right lower extremity from the knee to the foot. Marked occlusion was noted at the left ankle. Plaintiff was diagnosed with peripheral vascular disease (PVD), right greater than the left. It was determined that conservative treatment would be attempted, with statins and exercise for two months. Plaintiff was instructed to return in two months at which time further evaluation may be performed regarding stenting and carotid studies. (Tr. 611-12.)

Plaintiff visited the Clinic at the VA Medical Center on August 24, 2007, with complaints of left toe pain. Plaintiff reported having taken Percocet,[27] Tramadol and Ibuprofen for the

---

[27]Percocet (Oxycodone) is used to relieve moderate to severe pain. Medline Plus (last revised Feb. 1, 2011)<http://

pain, without relief. Examination showed mild redness and warmth, with severe tenderness to any amount of palpation or manipulation of the toe. Plaintiff was treated for a flare-up of gout and was given Colchicine. Plaintiff was given enough Colchicine so that he could self-treat the gout in the future. (Tr. 609-10.)

On August 31, 2007, plaintiff returned to Dr. Michael who noted plaintiff's medical history and the results of recent diagnostic testing. Plaintiff reported continued calf pain, as well as pain in his back, hips and feet. Plaintiff also reported generalized muscle pain mainly affecting his lower arms and lower legs. Plaintiff reported the pain associated with his recent gout flare up to have improved with medication. Physical examination showed no evidence of gout. Plaintiff reported his blood pressure to be low at home. Plaintiff was instructed to lower his dosage of HCTZ, and to return in November for follow up. (Tr. 605-09.)

Plaintiff was admitted to the VA Medical Center on October 18, 2007, to undergo artery angiography of the lower extremities. Plaintiff reported experiencing pain at rest. Plaintiff walked with a cane and complained of his legs giving out. It was noted that plaintiff was distraught in that his mother and brother both passed away that week. Results of the angiography showed severe atheromateous plaque and stenosis of the right common iliac artery (CIA), with large ulcerative plaque of the right external iliac

---

www.nlm.nih.gov/medlineplus/druginfo/meds/a682132.html>

artery. Tight stenosis of the left internal iliac artery was also noted, as well as moderate atheromateous plaque disease in both external iliac arteries. Complete occlusion was noted of both the left and right superficial femoral arteries (SFA), with fifty-percent stenosis at the origin of the right deep femoral artery. Poor flow was also noted. It was noted that plaintiff would likely need a CIA stent and possibly an SFA bypass. Plaintiff was instructed to return to the Clinic in November to discuss surgical options. (Tr. 534-48, 588-604.)

A surgical note written November 1, 2007, noted plaintiff to have severe peripheral arterial disease, and that right CIA stenting and right SFA angioplasty were to be scheduled. (Tr. 587.)

Plaintiff visited Dr. Michael on November 15, 2007, who noted plaintiff's recent medical history. Plaintiff reported having pain in his right leg at night and requested medication to help him sleep. Plaintiff also reported feeling depressed on account of his mother and brother recently passing away. It was noted that results of depression screening were positive, and Dr. Michael opined that plaintiff may have major depressive disorder. Plaintiff reported that he had been going to a support group, but declined Dr. Michael's offer to see a psychologist. Dr. Michael noted plaintiff's blood pressure to be elevated secondary to stress and non-compliance. Plaintiff was prescribed Amitriptyline and was instructed to increase his dosage of HCTZ. (Tr. 578-83.)

On December 4, 2007, plaintiff underwent surgery for the insertion of two CIA stents on the right, and left iliac artery angioplasty. (Tr. 578.) Plavix[28] was prescribed. (Tr. 576, 578.)

Plaintiff returned to Vascular Surgery on January 3, 2008, for follow up. It was noted that plaintiff's ABI had improved. Plaintiff reported that he was doing well and was able to walk farther. Plaintiff reported having occasional pain in his legs. Plaintiff was continued on his medications and was encouraged to increase his amount of exercise. Plaintiff was instructed to return in six months. (Tr. 571.)

Angela R. Bennett, a medical consultant with disability determinations, completed a Physical Residual Functional Capacity Assessment on January 9, 2008, in which she opined that plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and was limited in his ability to push and/or pull with his lower extremities. Ms. Bennett also opined that plaintiff could occasionally climb ramps, stairs, ropes, ladders, and scaffolds; could occasionally stoop, kneel, crouch, and crawl; and could frequently balance. Ms. Bennett opined that plaintiff should avoid concentrated exposure to extreme cold and heat; vibration;

---

[28]Plavix is used to prevent heart attacks or strokes by helping to prevent harmful blood clots. Medline Plus (last reviewed Nov. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601040.html>.

hazards; and fumes, odors, dusts, gases, and poor ventilation. Finally, Ms. Bennett opined that plaintiff had no manipulative, visual or communicative limitations. (Tr. 97-102.)

Plaintiff went to St. Louis University Hospital on June 27, 2008, for the purpose of undergoing lower extremity scanning using ultrasound guided angiogram in response to plaintiff's longstanding history of artherosclerotic disease which was currently presenting with rest pain of the left lower extremity. The artery could not be accessed for the procedure, however, and the procedure was aborted. Plaintiff was referred for a CT scan. (Tr. 813.)

On July 14, 2008, plaintiff was admitted to St. Louis University Hospital and underwent bilateral common femoral endarterectomy with angioplasty and veno patch, as well as bilateral common and external iliac stenting. It was noted that the procedure performed in December 2007 provided relief for approximately three months, but that, upon having his Plavix stopped, plaintiff had increasingly worse left lower extremity claudication which had progressed to rest pain. It was also noted that plaintiff had significant neuropathy, primarily in the left limb. It was noted that a previous attempt at endovascular repair was unsuccessful and that plaintiff required surgical repair. After surgery, plaintiff underwent physical therapy while in the hospital. Vascular laboratory testing performed on July 16, 2008, showed moderate arterial insufficiency in the bilateral lower extremities.

Plaintiff was discharged from the hospital on July 17, 2008. Sitting, lifting and driving limitations were put in place upon discharge. It was noted that plaintiff could use a walker to ambulate. Plaintiff's discharge medications included Plavix and Vicodin,[29] as well as an increase in Neurontin.[30] Plaintiff was instructed to take all other previously-prescribed medications with no change. (Tr. 807-23.)

On September 10, 2008, plaintiff spoke with a case manager at the VA Medical Center by telephone for follow up of a recent duodenal ulcer bleed. Plaintiff reported feeling weak and of having pain in his left foot at a level ten. It was noted that plaintiff's current medications included Amitriptyline, Citalopram,[31] Colchicine, Gabapentin, Lisinopril,[32] Omeprazole,[33] and Nifedipine,

---

[29]Vicodin (Hydrocodone) is used to relieve moderate to severe pain. Medline Plus (last revised Sept. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601040.html>.

[30]Neurontin (Gabapentin) is used to relieve the pain of post-herpetic neuralgia. Medline Plus (last revised Sept. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694007.html>.

[31]Citalopram (Celexa) is used to treat depression. Medline Plus (last revised Mar. 1, 2009)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html>.

[32]Lisinopril is used to treat high blood pressure. Medline Plus (last reviewed Feb. 1, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html>.

[33]Omeprazole is used to treat gastroesophageal reflux disease and to prevent the return of ulcers. Medline Plus (last revised Mar. 16, 2011)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692051.html>.

as well as various antibiotics. Plaintiff requested to speak to his physician regarding inadequate pain control. (Tr. 917-21.)

Plaintiff visited the VA Clinic on September 11, 2008, complaining of left foot and arm pain. Plaintiff reported the foot pain to be at a level seven, but to worsen with movement. Plaintiff reported to have had the pain intermittently for years, but that it had become constant within the last four to five months. Plaintiff reported that he takes increased dosages of codeine for the pain. The arm pain was related to recent placement of an intravenous line and was reported to be at a level ten with movement. Plaintiff also reported having a low mood. It was noted that plaintiff was frustrated with everything and felt like he would never get better. Plaintiff reported that he did not know what to do.[34] Physical examination showed range of motion to be within normal limits. Plaintiff's strength was measured to be 5/5 with radial pulses at 2+. Slight edema of the right foot was noted, with the great toe slightly tender to palpation. Sensation was noted to be intact on the plantar foot and decreased on the dorsal foot. Tinel's test was positive at the fibular neck. Plaintiff was diagnosed with

_____

[34]In a referral note from earlier in the day, a nurse noted that she had a "lengthy, tearful discussion" with plaintiff relating to doctors telling him that there was nothing that could be done for plaintiff's physical condition, that he felt the practitioners were not listening to his needs, that he was becoming a burden on his sister because of his loss of independence, that he was fearful of losing his home, and that he was fearful of missing upcoming psychiatric appointments due to lack of transportation. The nurse noted plaintiff to express fearfulness, sadness and despondence, and to describe a "life of chaos." (Tr. 915-16.)

extremity pain. It was questioned whether plaintiff's lower extremity pain was due to gout, radiculopathy or tarsal tunnel syndrome. Plaintiff was prescribed Vicodin. Plaintiff was also diagnosed with major depressive disorder and was instructed to see a clinic psychiatrist that afternoon. Plaintiff was instructed to continue with Citalopram and Amitriptyline. (Tr. 910-16.)

Plaintiff visited psychologist Peter A. Brewer later in the day on September 11, 2008, and reported feeling discouraged regarding his inability to secure transportation and his feeling like a burden on his sister who often takes him to and from medical appointments. It was suggested that plaintiff contact the Social Work Department regarding the provision of transportation services. (Tr. 909.)

The Social Work Department contacted plaintiff on September 15, 2008, out of concern for plaintiff's well-being and to check on plaintiff's transportation issues. Plaintiff's application for SSI was discussed, and plaintiff reported that his application was presently on appeal and that no benefits would be awarded until his appeal was heard. (Tr. 907.)

Plaintiff visited Dr. Karen S. Cowen, a psychiatrist, at the VA Medical Center on September 17, 2008, for treatment of depression and post-traumatic stress disorder (PTSD).[35] Dr. Cowen

_____

[35]Medical records show plaintiff's conditions of major depressive disorder (recurrent) and PTSD to have first been recorded on August 29, 2008. (Tr. 765.)

noted plaintiff's current medications to include: Amitriptyline, Colchicine, Gabapentin, Hydrocodone, Lisinopril, Nifedipine, and Omeprazole. Plaintiff reported having had a gastro-intestinal bleed since his last visit, which required a transfusion of six units of blood. Plaintiff reported having visual hallucinations when he was admitted for blood loss. Plaintiff denied any suicidal, homicidal or psychotic symptoms, but Dr. Cowen noted plaintiff to continue with depression. Plaintiff was not tearful this visit, but his affect was noted to be flat. Dr. Cowen noted plaintiff to continue to ambulate with a cane. Plaintiff's concentration was noted to be fair with full orientation. Plaintiff was provided with supportive psychotherapy. Plaintiff was instructed to resume Celexa, and it was added to his medication regimen. Plaintiff's treatment plan included individual psychotherapy and medication management. Plaintiff was assigned a Global Assessment of Functioning (GAF) score of 45 and was instructed to return in four weeks. (Tr. 766-70.)

Plaintiff went to the VA Clinic on September 30, 2008, with complaints of hip pain, wrist pain, headaches, and light-headedness. Plaintiff reported the hip pain to radiate to his back and that it progressively worsened when he walked. Plaintiff reported having to stop to rest with the onset of pain. Plaintiff reported a desire to increase his physical activity, but that the pain prevented him from doing so. Plaintiff reported the wrist pain

to have developed from the infiltrated IV and that the pain is sharp and knife-like and occurs with movement. Plaintiff reported that the headaches began one month prior and sometimes become migraine-like with sensitivity to light. Plaintiff reported that he experienced light-headedness when standing and when experiencing hip pain, and that such sensation began after a recent adjustment to his medication. Physical examination showed pain in the right and left hip with certain range of motion exercises. Plaintiff's wrist was tender to palpation, but had full range of motion. Vicodin was prescribed for pain, and plaintiff was encouraged to exercise. As to his other complaints, plaintiff was instructed to make sure he was taking the proper dosages of medication. (Tr. 897-902.)

Plaintiff visited Psychology Outpatient on October 17, 2008, and saw psychologist Richard P. Martielli. Dr. Martielli noted plaintiff's feelings of frustration, discouragement and hopelessness. Plaintiff denied suicidal ideation. Plaintiff reported transportation to be an ongoing problem getting to and from his appointments. Plaintiff was referred to the Social Work Department and plaintiff's upcoming appointments were reviewed, including an appointment later that day with Dr. Cowan. (Tr. 896-97.)

When plaintiff visited the Social Work Department, it was noted that plaintiff was sad, tearful, despaired, and somewhat hopeless that his physical pain would ever go away. Plaintiff

reported not being able to work for one year, and that he felt useless and did not like to depend on others. Plaintiff reported that he had struggled physically for ten years and that he was tired of fighting emotionally. Plaintiff stated that he was at his last resort in asking for help and that if could not get help, he wanted to walk away and not come back. Plaintiff stated that he knew he would not take his own life. Plaintiff reported that he feared that his psychotropic medication would cause him not to wake up, but stated that he felt better with the medication. It was noted that plaintiff did not take his medication that morning. Plaintiff reported feeling better after having been able to cry, share what he was feeling, and talk to Dr. Martielli. Plaintiff was encouraged to continue to see his psychiatrist and to report to his physician regarding the great pain he was in. (Tr. 893-95.)

Later in the day on October 17, 2008, plaintiff visited Dr. Cowen who noted that plaintiff "continue[d] with a full spectrum of PTSD and depressive symptoms." Plaintiff reported his sleep and appetite to be fair, and that his emotions had improved with a decrease in crying spells. Plaintiff denied any suicidal or homicidal ideations. Plaintiff's mood and affect were noted to be abnormal, with his mood described as depressed and angry, and his affect described as blunted and somewhat irritable. Dr. Cowen noted delusions and/or hallucinations to be present with reported flashbacks. It was noted that plaintiff had fair/poor concentration

with full orientation. Dr. Cowen instructed plaintiff to increase his dosage of Celexa and to continue his other medications as prescribed. Plaintiff was provided supportive psychotherapy. Plaintiff's treatment plan included group therapy, individual psychotherapy, and medication management. Plaintiff was assigned a GAF score of 47 and was instructed to return in one month. (Tr. 772-77.)

Plaintiff visited Dr. Michael on October 23, 2008, who noted plaintiff's medical history. Dr. Michael specifically noted that since plaintiff's endarterectomy procedure in July 2008, he experienced complications with a bilateral groin infection for which he was subsequently admitted to the hospital. Dr. Michael noted that plaintiff was then admitted to the hospital in September 2008 for a bleeding ulcer caused by aspirin/Plavix, and that he experienced an infiltration of an IV on the left at that time. Dr. Michael noted plaintiff to continue to experience pain due to the IV infiltration, and that he experienced shooting pains in his right groin down to the knee from scar tissue affecting the nerve. Plaintiff reported his pain to be at a level seven. Upon physical examination, Dr. Michael diagnosed plaintiff with the following: PVD, status post bilateral endarterectomy and stenting of femoral arteries, with complications during post operative course; nerve pain due to scarring around right femoral nerve; history of peptic ulcer disease/upper gastrointestinal bleed in September 2008 on

aspirin/Plavix; right leg L5-S1 radiculopathy; hypertension, controlled; gout, resolved – on chronic Colchicine. Plaintiff was instructed to follow up with Vascular Surgery and with Rheumatology. Plaintiff was instructed to increase his dosages of Gabapentin, and to restart Simva[36] and aspirin. Plaintiff was also instructed to take Omeprazole every day for ulcer prophylaxis. Plaintiff was instructed to return to Dr. Michael in three months. (Tr. 883-88.)

Plaintiff visited Rheumatology on October 24, 2008. Dr. Hector Molina-Vicenty noted plaintiff's foot pain to be different from his gout pain. Plaintiff complained of burning pain in the left foot which began prior to his July 2008 surgery and had not resolved. Dr. Molina-Vicenty noted the pain to be reproduced with the lightest touch and not to have responded to Colchicine. Plantar flexion caused pain to radiate to the lower leg. No redness, warmth or swelling was noted about the area, but hyperpigmentation was observed. Dr. Molina-Vicenty reviewed plaintiff's previous lab studies, EMG and nerve conduction studies, MRI, and foot x-rays. Dr. Molina-Vicenty questioned whether plaintiff had neuropathy, reflex sympathetic dystrophy (RSD), inflammatory arthropathy, or osteopenia. Additional diagnostic testing was ordered. No specific therapy was recommended and plaintiff was instructed to return in one month. (Tr. 880-83.)

---

[36]Simvastatin is used to decrease the amount of cholesterol and other fatty substances in the blood. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692030.html>.

The results of subsequent diagnostic testing did not support a finding of acute inflammatory arthritis or acute gout. X-rays showed degenerative joint disease of the first toe and mild ankle swelling. Results of ANA testing were negative. (Tr. 883.) Results of a bone scan and x-rays were not compatible with a finding of RSD. (Tr. 878.)

Plaintiff visited Herbert Lomax, LCSW, Ph.D, at the Social Work Department on November 4, 2008. Dr. Lomax noted plaintiff's diagnoses of PTSD and major depression. Dr. Lomax noted plaintiff's depression to be related to his inability to accept his disability and lack of capacity for employment. It was noted that plaintiff found it difficult to request and accept help due to the stigma associated with psychiatric illness. Plaintiff was instructed to return in two to three weeks for psychotherapy. (Tr. 879-80.)

Plaintiff returned to Dr. Molina-Vicenty on November 19, 2008. Physical examination showed positive straight-leg raising bilaterally with pain in the lower back and gluteal area. No swelling, redness, rash, or warmth was noted about the left ankle or foot. Pain upon light palpation was noted about the dorsum of the left foot, radiating to the lateral shin. Plaintiff had full range of motion about the left ankle without pain, but pain upon flexion of the left first toe. Dr. Molina-Vicenty reviewed the results of recent diagnostic testing and suspected a neurologic source for plaintiff's pain. Dr. Molina-Vicenty specifically noted

plaintiff's history of right L4-L5 radiculopathy and left paracentral disc bulge with narrowing of the left lateral recess and bilateral mild facet hypertrophy. Dr. Molina-Vicenty expressed concern about progression of degenerative disc disease with nerve involvement. An MRI was ordered and plaintiff was instructed to return in three months. (Tr. 876-79.)

Plaintiff returned to Dr. Lomax on November 25, 2008. Plaintiff reported some relief of his symptoms with his current medication. Psychotherapy was provided. (Tr. 767.)

Plaintiff returned to Dr. Cowan on December 2, 2008, and reported that he felt better emotionally but continued with severe pain. Plaintiff denied any suicidal, homicidal or psychotic symptoms. Dr. Cowan noted plaintiff to be at high risk for assaultive ideation and behavior. Plaintiff reported being less aggressive with an increase in his medications. Dr. Cowan noted there to be overall improvement. Plaintiff was referred to group therapy and was instructed to increase his dosage of Celexa. (Tr. 874-75.)

Plaintiff returned to Vascular Surgery on December 4, 2008, for follow up. It was noted that plaintiff was "not threatening and less angry." Recent vascular studies were noted to show moderate arterial insufficiency in both lower extremities at rest. Upon examination, it was noted that plaintiff was improving. Plaintiff was instructed to continue with exercise and to continue

management of his neuropathic pain with his general physician and rheumatologist.  Plaintiff was instructed to return in six months. (Tr. 873-74.)

Plaintiff visited the VA Clinic on December 12, 2008, and complained of having worsening sharp back pain for one week brought on by bending to put on some socks.  Plaintiff reported that lifting his arms overhead worsened the pain, causing it to shoot down his legs and to his upper back.  Plaintiff reported getting minimal relief with lying down, and further reported that he was losing sleep because of his back pain.  Plaintiff also reported having chronic numbness, tingling and weakness of the left leg.  Plaintiff was noted to walk slowly with a cane.  Physical examination showed moderate tenderness at the lower lumbar-sacral spine process and muscle.  Straight leg raising was positive on the left.  Moderate to severe tenderness was noted about the right anterior thigh. Plaintiff had full range of motion about the right hip and both knees.  Limited range of motion was noted about the left hip. Worsening nerve compression was suspected.  After being administered an injection of Toradol, plaintiff was sent to see Dr. Molina-Vicenty.  (Tr. 869-73.)

On that same date, December 12, 2008, plaintiff visited Dr. Molina-Vicenty and reported his back pain to be at a level eight, without relief from Vicodin.  Physical examination showed positive straight leg raising bilaterally with pain in the lower

back radiating to the leg.  Severe left paraspinal muscle spasms were noted.  Dr. Molina-Vicenty expressed concern about progression of degenerative disc disease with nerve involvement.  Plaintiff was instructed to treat with Flexeril until an MRI could be arranged. (Tr. 867-68.)

Results of the MRI showed left lateral disc bulge L4-L5 with compromise of the left lateral recess and the neuroforamina. No significant change from the July 2007 study was noted.  Dr. Molina-Vicenty determined to follow up with nerve conduction studies due to the severity and radicular characteristics of plaintiff's symptoms.  (Tr. 868-69.)

Plaintiff underwent a consultative physical examination for disability determinations on December 15, 2008.  Dr. Raymond Leung noted plaintiff's medical history of arthritis, hypertension, decreased circulation, and depression.  Plaintiff reported having back pain which may radiate down both legs, and that he uses a cane when he has increased pain.  Dr. Leung noted that plaintiff brought a four-legged cane to the examination.  Plaintiff also reported occasional difficulties gripping things with his hands.  Plaintiff reported having pain in his legs with every step on account of his circulatory problems.  Dr. Leung noted plaintiff's overall speed of movement to be slow, that plaintiff developed moderately severe pain through the examination, and that plaintiff moaned and groaned.  Dr. Leung opined that the pain seemed somewhat exaggerated.  Mini mental

status examination showed plaintiff to be alert and oriented times three. Plaintiff's memory appeared intact and fund of knowledge appeared normal. Dr. Leung noted plaintiff to be irritable and to have decreased eye contact. It was noted that plaintiff required coaching to do the examination. Musculoskeletal examination showed plaintiff's gait, both with and without the cane, to be slow with short strides and a waddle. Plaintiff was able to walk fifty feet unassisted. Plaintiff was able to tandem walk and hop, but could not heel walk or toe walk. Plaintiff could squat less than one-fourth of the way down. Plaintiff had decreased range of motion about his knees, hips and cervical spine. Plaintiff had full range of motion of the lumbar spine. Plaintiff had no muscle atrophy or spasms. Pinch strength, arm, leg and grip strength were measured to be 4/5 throughout. Dr. Leung observed plaintiff to have no difficulties getting on and off the examination table. (Tr. 786-89, 797-98.)

On that same date, December 15, 2008, Dr. Leung completed a Medical Source Statement (Physical) in which he opined that plaintiff could occasionally lift and carry up to ten pounds; sit for eight hours in an eight-hour workday, stand for a total of two hours, and walk for one hour in an eight-hour workday. Dr. Leung opined that plaintiff could stand without interruption for up to one hour, and sit without interruption for eight hours. Dr. Leung opined that plaintiff would benefit with the use of a cane, and

noted that plaintiff stated he could walk only five to ten feet without a cane. Dr. Leung opined that plaintiff could continuously feel and reach in all directions, and could occasionally handle, finger, and push/pull. Dr. Leung also opined that plaintiff could occasionally operate foot controls with his left and/or right foot. Dr. Leung opined that plaintiff could frequently balance, but could never climb stairs or ramps, climb ladders or scaffolds, stoop, kneel, crouch, or crawl. Dr. Leung opined that plaintiff could never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle; but could continuously be exposed to humidity and wetness, dust, odors, fumes, pulmonary irritants, extreme cold, extreme heat, and vibrations. Dr. Leung opined that plaintiff was unable to walk a block at a reasonable pace on rough or uneven surfaces, but could engage in activities such as shopping, traveling without a companion, use public transportation, prepare simple meals, climb a few steps at a reasonable pace with the use of a single handrail, care for personal hygiene, and sort and handle paper files. (Tr. 790-96.)

On December 15, 2008, plaintiff underwent a consultative psychological evaluation for disability determinations. (Tr. 801-02.) Dr. John S. Rabun noted plaintiff's medical history. Dr. Rabun also noted the following:

> Mr. Holden appeared to be in pain throughout the interview. He was withdrawn, negative in demeanor, and angry. He was easily

> agitated. He described social withdrawal, a
> sad frame of mind more days than not,
> irritability, thoughts of worthless [sic] and
> hopelessness, and showed decreased psychomotor
> activity coupled with decreased spontaneity
> while speaking, an increased latency when
> replying to questions. He also showed deficits
> in concentration. He said that he feels
> "depressed" and has been for multiple months.
> His depression is caused by chronic pain. He
> is taking Elavil and Citalopram, but continues
> to be depressed. He is in psychiatric
> treatment, but was never psychiatrically
> hospitalized.

(Tr. 801.)

Mental status examination also showed plaintiff to lose his train of thought and not to engage in goal-directed conversations. Plaintiff's affect was noted to be restricted and irritable. Plaintiff's content of thought revealed symptoms of major depression. Dr. Rabun noted plaintiff's poor concentration to be caused by his depression. Dr. Rabun diagnosed plaintiff with major depressive disorder (single episode, severe) and assigned a GAF score of 40. Dr. Rabun concluded that plaintiff "would have mild difficulty focusing, concentrating and remembering instructions. He would have moderate difficulty interacting appropriately in a social setting and adapting to changes in a work environment." (Tr. 802.)

On that same date, December 15, 2008, Dr. Rabun completed a Medical Source Statement (Mental) in which he opined that plaintiff had mild restrictions in his ability to understand,

remember and carry out simple instructions; understand, remember and carry out complex instructions; and make judgments on simple and complex work-related decisions. Dr. Rabun also opined that plaintiff had moderate restrictions in his ability to interact appropriately with the public, supervisors, and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (Tr. 803-05.)

Plaintiff returned to Dr. Lomax on December 29, 2008, who noted presenting problems of alcohol abuse and PTSD. Psycho-educational counseling was provided relating to maladaptive coping. A plan was made for plaintiff to attend Alcoholics Anonymous and to continue with individual psychotherapy. (Tr. 867.)

Plaintiff underwent a limited physical examination at the VA Medical Center on January 6, 2009, for purposes of determining eligibility for veteran's pension and compensation. The examination related to injuries and/or conditions sustained as a result of military service. The examination resulted in a diagnosis of degenerative joint disease of the left knee, and normal left hip. (Tr. 863-67.)

Plaintiff reported to Dr. Molina-Vicenty on January 13, 2009, that his pain had not worsened, but also that it had not improved. (Tr. 869.)

Plaintiff returned to Dr. Cowan on January 13, 2009, for treatment of PTSD and depression. It was noted that plaintiff felt

somewhat better emotionally. Plaintiff reported continued chronic pain. Plaintiff denied any suicidal, homicidal or psychotic symptoms. Plaintiff expressed hope that he would receive veteran's benefits and not lose his home. Plaintiff was instructed to resume additional psychotherapy. (Tr. 862-63.)

Plaintiff visited Dr. Michael on January 29, 2009, and complained of continued knife-like pain in both feet with walking. Dr. Michael noted vascular studies not to show much improvement in circulation with stents. Dr. Michael continued in her previous diagnoses and adjusted plaintiff's blood pressure medication to improve control. Niacin[37] was added to plaintiff's medication regimen. Plaintiff was instructed to participate in pool exercises and an EMG was ordered. Plaintiff was instructed to return in four months. (Tr. 858-62.)

Plaintiff underwent EMG and nerve conduction studies (NCV) at the VA Medical Center on February 23, 2009. Results from the NCV were normal. The EMG studies, however, showed evidence of left lower lumbar radiculopathy, with ongoing denervation of the left gastrocnemius and left paraspinal muscle. (Tr. 960-62.)

Plaintiff visited Dr. Molina-Vicenty on February 27, 2009, who noted the results of the recent diagnostic tests. Plaintiff reported that the burning pain did not respond to Gabapentin,

---

[37]Niacin is used to reduce the amount of cholesterol and certain fatty substances in blood. Medline Plus (last revised Oct. 1, 2010)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682518.html>.

Elavil, Flexeril, or Vicodin. Physical examination showed plaintiff to have positive straight leg raising bilaterally with pain in the lower back, radiating to the leg. No swelling, warmth or redness was noted in the lumbar area. Severe paraspinal muscle spasms were noted on the left. Dr. Molina-Vicenty diagnosed plaintiff with possible degenerative disc disease with nerve entrapment with acute exacerbation. It was noted that there was no evidence of inflammatory arthropathy or active gout. Dr. Molina-Vicenty determined to refer plaintiff to Neurology, and plaintiff was instructed to return to Dr. Molina-Vicenty as needed. (Tr. 957-58.)

Plaintiff visited the Social Work Department on March 2, 2009, to update on his current status. Plaintiff reported that he received VA compensation resulting in him now having a small income. Plaintiff reported that things seemed to be going better, that he was active in his church, and that his family was doing well. (Tr. 956-57.)

Plaintiff participated in his first session of exercise therapy on March 2, 2009, during which he performed stretching exercises, walked five laps around the gym, rode an exercise bike for ten minutes, and participated in aquatic exercises. It was noted that plaintiff tolerated the exercise session well. (Tr. 956.) Plaintiff was discharged from the exercise program on March 9, 2009, inasmuch as it was determined that he could exercise

without supervision.   Plaintiff was placed on a self-directed personal exercise program.  (Tr.  953-54.)

Plaintiff visited Neurology at the VA Medical Center on March 12, 2009, for neurological assessment.  Plaintiff's longstanding complaints were noted to be of low back pain and burning sensations in his feet.  Plaintiff also reported pain and numbness in the right anterior thigh, and it was noted that plaintiff was not able to feel scratching on the right thigh. Plaintiff reported not obtaining much relief with Gabapentin, and it was recommended that plaintiff try Lidoderm patches.[38]  Physical examination showed normal strength, hyperalgesia in both feet (left greater than the right), and decreased reflexes bilaterally in the lower extremities.  Upon completion of the physical examination and review of plaintiff's diagnostic studies, plaintiff was diagnosed with peripheral ischemic neuropathy and L4-L5 radiculopathy.  It was opined that plaintiff may have complex regional pain syndrome or reflex sympathetic dystrophy involving the right anterior and medial thigh.  Plaintiff was referred to a pain clinic for pain management and to physical therapy for back strengthening and range of motion exercises.  Plaintiff was instructed to continue with aspirin and statins, and to begin folic acid and other vitamins.  Plaintiff was also instructed to continue with Gabapentin and Amitriptyline.

_____

[38]Lidoderm patches use a local anesthetic to relieve the pain of post-herpetic neuralgia.  Medline Plus (last reviewed Sept. 1, 2008)<http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603026.html>.

Laboratory tests were ordered.  Plaintiff was instructed to return in a few months for further assessment.  (Tr.  943-53.)

On April 6, 2009, Dr. Molina-Vicenty completed a Physical Medical Source Statement in which he reported his current diagnoses of plaintiff to be peripheral ischemic neuropathy, L4-L5 radiculopathy, and degenerative disc disease.  Dr. Molina-Vicenty stated that plaintiff's neuropathic pain caused limitations in plaintiff's ability to balance — even when standing or walking on level terrain, and that plaintiff should use a cane.  Dr. Molina-Vicenty opined that plaintiff could sit, stand or walk fifteen to thirty minutes at a time, without a break.  Dr. Molina-Vicenty further opined that, in an eight-hour workday, plaintiff could sit, stand or walk ninety minutes or less.  Dr. Molina-Vicenty opined that plaintiff could frequently lift two to five pounds and could occasionally lift ten pounds.  Dr. Molina-Vicenty stated, however, that plaintiff could not *carry* such weight inasmuch as his neuropathic pain compromises his balance.  Dr. Molina-Vicenty further opined that plaintiff could occasionally reach above his head, but could rarely stoop, crouch, crawl, or climb ladders or scaffolds.  Dr. Molina opined that plaintiff could tolerate frequent exposure to odors or dust, noise, vibration, and extremes in temperature or humidity.  Dr. Molina-Vicenty expressed no opinion regarding plaintiff's ability to manipulate his hands.  Dr. Molina-Vicenty also reported that plaintiff's ischemic neuropathy and L4-L5

radiculopathy produced pain and that plaintiff experienced such pain frequently each day, including all day. Dr. Molina-Vicenty reported that plaintiff's pain was shown objectively through sensory disruption and nerve conduction studies, as well as subjectively through complaints of pain, irritability and grimaces. Dr. Molina-Vicenty opined that plaintiff would need to lie down during an eight-hour workday due to pain. Dr. Molina-Vicenty also opined that plaintiff would need to take breaks more frequently than every hour due to pain. (Tr. 924-27.)

On April 15, 2009, plaintiff requested, and was provided, a new prescription for Hydrocodone. (Tr. 941-42.)

On June 12, 2009, Dr. Cowan completed a Mental Medical Source Statement in which she noted plaintiff's diagnosed conditions to be PTSD and major depression. Dr. Cowan gave no opinion as to plaintiff's limitations experienced in the domains of Activities of Daily Living or Social Functioning, but opined that plaintiff experienced moderate to extreme limitations in the domain of Concentration, Persistence or Pace. Dr. Cowan opined that plaintiff's impairment would cause unpredictable interruptions during a normal workday or workweek, albeit of an unknown frequency or duration. Dr. Cowan also opined that plaintiff's impairment would cause him to arrive late to work unpredictably, albeit of an unknown frequency. Dr. Cowan also opined that plaintiff's impairment would cause him to be absent from work on many occasions.

Dr. Cowan noted that she first saw plaintiff in August 2008, and that plaintiff's limitations have lasted or could be expected to last twelve continuous months. Dr. Cowan noted her last GAF assessment of plaintiff in January 2009 was 45, and that plaintiff's highest GAF assessment within the previous year was 48. (Tr. 964–67.)

## IV. The ALJ's Decision

The ALJ found plaintiff to have met the insured status requirements of the Social Security Act through December 31, 2012. The ALJ further found that plaintiff had not engaged in substantial gainful activity since June 12, 2007. The ALJ found plaintiff's severe impairments to include peripheral artery disease, degenerative disc disease of the lumbar spine, major depression, and PTSD, but determined that plaintiff did not have an impairment or combination of impairments which met or medically equaled an impairment listed in Appendix 1, Subpart P, Regulations No. 4. The ALJ found plaintiff to have the residual functional capacity (RFC) to perform sedentary work, except that he could sit for only six hours per day; stand and walk only two hours per day; have only occasional use of the lower extremities for foot pedals or controls; could only occasionally climb, stoop, crouch, crawl, and kneel; occasionally climb ladders, ropes or scaffolds; could not have any concentrated exposure to hazards such as unprotected heights or machinery, dust, fumes, gases, extreme heat, cold, or vibrations;

and could have only occasional interaction with supervisors, co-workers, and the general public. The ALJ found plaintiff's subjective complaints not to be credible to the extent they were inconsistent with the above RFC findings. The ALJ found plaintiff unable to perform his past relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined there to be a significant number of jobs in the national economy that plaintiff could perform, and specifically, hand assembler and machine tender. Because the ALJ found plaintiff able to perform other work existing in significant numbers in the national economy, he determined plaintiff not to be under a disability at any time from June 1, 1997, through the date of the decision. (Tr. 13-21.)

## V. Discussion

To be eligible for Social Security Disability Insurance Benefits and Supplemental Security Income under the Social Security Act, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared

disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the

economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. Pearsall, 274 F.3d at 1217 (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." Weikert v. Sullivan, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); see also Jones ex rel. Morris v. Barnhart, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff generally claims that the ALJ's decision is not supported by substantial evidence on the record as a whole. Plaintiff also specifically contends that the Appeals Council failed to consider and/or failed to properly consider the new evidence submitted to it when determining whether to review the ALJ's

decision.  Plaintiff also specifically contends that the ALJ erred by failing to explain the weight given to the opinion of consulting physician Dr. Leung, and by failing to adequately explain the weight given to the opinion of plaintiff's treating physician, Dr. Molina-Vicenty.

A.    <u>Appeals Council Review</u>

Subsequent to the ALJ's adverse decision in this cause, plaintiff's counsel submitted a request to the Appeals Council that it review the ALJ's decision.  (Tr. 8-9.)  Counsel thereafter submitted a brief in support of the request, with a copy of Dr. Cowan's June 2009 Mental Medical Source Statement (MMSS) enclosed therewith.  (Tr. 267-69, 964-67.)  The Appeals Council made counsel's brief and the additional evidence a part of the record. (Tr. 5.)  In its Notice denying plaintiff's request for review of the ALJ's decision, the Appeals Council stated:

> In looking at your case, we considered the reasons you disagree with the decision in the material listed on the enclosed Order of Appeals Council.[39]
>
> We found that this information does not provide a basis for changing the Administrative Law Judge's decision.

(Tr. 1-2.)

Plaintiff claims that these statements by the Appeals Council are

_____

[39]The "enclosed Order" lists the attorney's brief and the additional medical evidence from Dr. Cowan.  (Tr. 5.)

ambiguous in that they render it uncertain as to whether the Appeals Council indeed reviewed the evidence from Dr. Cowan, and if it did so, what weight it gave such evidence. Citing Lamp v. Astrue, 531 F.3d 629 (8th Cir. 2008), plaintiff contends that such ambiguity requires that the matter be remanded. For the following reasons, the circumstances of this case do not require remand on this basis.

The Commissioner's regulations provide that the Appeals Council must consider "new and material evidence" that "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. §§ 404.970(b), 416.1470(b). To be considered "new," the evidence "'must be more than merely cumulative of other evidence in the record.'" Lamp v. Astrue, 531 F.3d 629, 632 (8th Cir. 2008) (quoting Bergmann v. Apfel, 207 F.3d 1065, 1069 (8th Cir. 2000)). Additional evidence is material if it is "'relevant to claimant's condition for the time period for which benefits were denied.'" Id. (quoting Bergmann, 207 F.3d at 1069). The failure of an Appeals Council to consider new and material evidence may be a basis for remand. Box v. Shalala, 52 F.3d 168, 171-72 (8th Cir. 1995). Where uncertainty exists as to whether the Appeals Council considered new and material evidence, remand is appropriate for an ALJ to consider such evidence. Lamp, 531 F.3d at 633.

In this cause, there is no uncertainty as to whether the Appeals Council considered the June 2009 MMSS from Dr. Cowan. The Appeals Council clearly identified the MMSS in its Order setting out

the additional evidence submitted and considered. The Appeals Council clearly stated that it considered the information contained in such material when it determined not to review the ALJ's decision. To the extent plaintiff argues that the Appeals Council's statement that it considered the "reasons you disagree with the decision" indicates that it only considered plaintiff's brief and not the additional medical evidence, plaintiff's argument and reliance on <u>Lamp</u> in this regard is misplaced.

In <u>Lamp</u>, claimant's counsel sent a letter to the Appeals Council along with a dated statement from the claimant's treating physician. Also submitted with counsel's letter was an undated letter from the physician. In counsel's letter to the Appeals Council, he failed to mention the physician's undated letter as a separate document being submitted for consideration. When identifying the additional evidence upon which it relied in denying claimant's request for review, the Appeals Council in <u>Lamp</u> only referred to the physician's *dated* statement. "Although Lamp's attorney failed to mention [the physician's] undated letter as a separate document in his letter to the Appeals Council, the record clearly indicates that Lamp's attorney submitted the undated letter along with [the physician's] [dated] statement." <u>Lamp</u>, 531 F.3d at 632. As such, in light of the Appeals Council's failure to identify the undated letter as additional evidence despite the record being clear with regard to the submission of the letter, the Eighth

Circuit was unable to determine whether the Appeals Council indeed reviewed the undated letter.[40] <u>Id.</u> at 632-33. Given this uncertainty, the Eighth Circuit determined that remand was appropriate for an ALJ to consider the new and material evidence. <u>Id.</u> at 633 (citing <u>Gartman v. Apfel</u>, 220 F.3d 918, 922 (8th Cir. 2000)).

Here, in his brief to the Appeals Council, plaintiff's counsel specifically referred to Dr. Cowan's June 2009 MMSS (Tr. 268-69) and identified the four-page MMSS as an enclosure submitted with the brief (Tr. 269). In its Order setting out the additional evidence received and considered, the Appeals Council specifically identified Dr. Cowan's June 2009 MMSS as among such evidence (Tr. 5) and, further, referred to the MMSS in its Exhibit List, specifically identifying it as Exhibit 12F (Tr. 4). A review of the administrative transcript shows Dr. Cowan's June 2009 MMSS to immediately follow Exhibit 11F in the record. (Tr. 964-67.) In light of counsel's specific reference to the MMSS in his brief, the notation of its enclosure with the brief submitted to the Appeals Council, the Appeals Council's reference to the MMSS in its Order setting out additional evidence, the Appeals Council's identification of the MMSS in its List of Exhibits, and the Appeals

---

[40]The Eighth Circuit also determined the undated letter to constitute new and material evidence inasmuch as the information contained therein was information which the ALJ expressed in his written decision would have been helpful in assessing other evidence of record. <u>Lamp</u>, 531 F.3d at 633.

Council's reference to the material and information submitted in its Notice of Action, it cannot be said that uncertainty exists regarding whether the Appeals Council considered the MMSS. Plaintiff's argument in this regard should be denied.

To the extent plaintiff claims that the Appeals Council failed to explain the weight given to Dr. Cowan's MMSS, if indeed it considered such evidence, this argument is likewise misplaced. As noted by the Eighth Circuit in <u>Browning v. Sullivan</u>, 958 F.2d 817 (8th Cir. 1992), any argument that the Appeals Council must articulate its own assessment of additional evidence "misconstrues the function of the Appeals Council under the [Commissioner's] regulations." <u>Id.</u> at 822. When new and material evidence is submitted to the Appeals Council, the regulations require only that the Appeals Council evaluate the entire record with such evidence, and review the case *if* the ALJ's action, findings or conclusion is contrary to the weight of the evidence currently of record. 20 C.F.R. §§ 404.970(b), 416.1470(b). There is no requirement that the Appeals Council document its findings from its evaluation of new evidence in cases in which it determines not to review the ALJ's decision. <u>Compare</u> 20 C.F.R. §§ 404.970(b), 416.1470(b) (no requirement for Appeals Council to make written findings upon evaluation of new evidence), <u>with</u> 20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2) (Appeals Council required to make written findings on evaluation of mental impairments only in cases in which it *issues*

*a decision)*.

In the instant case, upon consideration of additional evidence, the Appeals Council determined not to review the ALJ's decision. The regulations do not direct the Appeals Council to articulate its own assessment of such additional evidence in cases in which it determines *not* to review an ALJ's decision. In the absence of such regulatory directive, the Court should decline plaintiff's invitation to mandate such an analysis.

B.    Weight Given to Physicians' Opinions

Plaintiff also specifically claims that the ALJ erred by failing to explain the weight given to the opinion of consulting physician Dr. Leung, and by failing to adequately explain the weight given to the opinion of plaintiff's treating physician, Dr. Molina-Vicenty. For the following reasons, plaintiff's contentions are well taken.

In evaluating opinion evidence, the regulations require the ALJ to explain in the decision the weight given to any opinions from treating sources, nontreating sources and nonexamining sources. See 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). In the decision here, the ALJ acknowledged consulting physician Dr. Raymond Leung's examination of plaintiff (Tr. 18), but failed to explain what weight, if any, he gave to Dr. Leung's opinions which were expressed in his Physical Medical Source Statement. The ALJ's failure to explain the weight given to Dr. Leung's opinion evidence

was error.

The ALJ likewise erred in his treatment of Dr. Hector Molina-Vicenty's opinion evidence. As early as October 2002, plaintiff was referred to the Department of Rheumatology at the VA Medical Center for evaluation and determination of the etiology of his complaints and symptoms. Although the etiology of plaintiff's complaints remained unknown, plaintiff was monitored by the Department of Rheumatology while continuing to undergo treatment and regular examinations by his general physician. In October 2008, plaintiff began undergoing regular examination and treatment in the Department of Rheumatology and, specifically, by Dr. Molina-Vicenty. From October 2008 through February 2009, plaintiff saw Dr. Molina-Vicenty on no less than five occasions, with Dr. Molina-Vicenty conducting physical examinations, diagnostic testing and medication therapy, with continual adjustments due to plaintiff obtaining little relief, if any, from treatment. Upon review of such examinations, the results of diagnostic evaluations and the continued failure of plaintiff's medication regimen, Dr. Molina-Vicenty ultimately determined to refer plaintiff to the Department of Neurology given plaintiff's continued exacerbated symptoms which Dr. Molina-Vicenty thought to be compatible with degenerative disc disease with nerve entrapment.[41]

_____

[41]Notably, upon being examined in the Department of Neurology in March 2009, plaintiff was diagnosed with peripheral ischemic neuropathy and L4-L5 radiculopathy, with opinions expressed that plaintiff may have complex regional pain syndrome or reflex

In April 2009, Dr. Molina-Vicenty completed a Physical Medical Source Statement (PMSS) in which he opined that plaintiff suffered significant exertional limitations. The ALJ determined to accord the PMSS little weight:

> Dr. Vincenty [sic] opined that the claimant could sit, stand and walk for only 90 minutes apiece, could lift no more than 10 pounds occasionally and would have to lie down hourly during the day. Dr. Molina-Vicenty's opinion is not supported by the medical record, which has no mention of the need to lie down that long, nor does it comport with the sitting capabilities of the claimant, who did not testify to any real sitting limitations. Dr. Molina-Vicenty's opinion is given little weight as a result.

(Tr. 19.) (Citation to exhibits omitted.)

The ALJ then went on to find the January 2008 RFC assessment completed by nonexamining medical consultant Bennett "largely consistent with the medical evidence of record." (Id.) Other than imposing a two-hour limitation in plaintiff's ability to stand and walk, the ALJ determined plaintiff's RFC to be in accordance with Ms. Bennett's assessment. (Id.)

The Commissioner's regulations require that the opinions of treating physicians be given more weight than other sources. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). A treating physician's assessment of the nature and severity of a claimant's impairments

---

sympathetic dystrophy. Plaintiff was thereafter referred to a pain clinic for pain management.

should be given controlling weight if the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004). This is so because a treating physician has the best opportunity to observe and evaluate a claimant's condition,

> since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Opinions of treating physicians do not automatically control in determining disability, however, inasmuch as the Commissioner is required to evaluate the record as a whole. Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007); Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004). The ALJ may discount or disregard such opinions if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001). In addition, inconsistency with other substantial evidence alone is sufficient to discount a treating physician's opinion.

Goff v. Barnhart, 421 F.3d 785, 790-91 (8th Cir. 2005).

When a treating physician's opinion is not given controlling weight, the Commissioner must look to various factors in determining what weight to accord the opinion, with such factors including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, whether the treating physician provides support for his findings, whether other evidence in the record is consistent with the treating physician's findings, and the treating physician's area of specialty. The regulations further provide that the Commissioner "will always give good reasons in [the] notice of determination or decision for the weight [given to the] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, the ALJ determined to accord Dr. Molina-Vicenty's opinion little weight inasmuch as plaintiff did not testify to "any real sitting limitations," and because the medical record did not support Dr. Molina-Vicenty's opinion that plaintiff "would have to lie down hourly during the day[.]" (Tr. 19.) Where a treating physician's opinion is inconsistent with other substantial evidence of record, an ALJ does not err in discounting such opinion. Goff, 421 F.3d at 790-91; see also Medhaug v. Astrue, 578 F.3d 805, 815-16 (8th Cir. 2009). In this cause, however, the ALJ determined to discount the opinion of plaintiff's treating physician by citing certain perceived inconsistencies where they did not exist. As

such, these "inconsistencies" are not sufficient to constitute good reasons for the ALJ to accord less than controlling weight to the treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

First, the ALJ stated that Dr. Molina-Vicenty reported in his PMSS that plaintiff "would have to lie down hourly during the day[.]" (Tr. 19.) A review of the PMSS, however, shows Dr. Molina-Vicenty not to have rendered such an opinion. In his PMSS, Dr. Molina-Vicenty opined that, because of pain, plaintiff would have "to lie down . . . during a normal 8-hour workday" for an "indetermined" [sic] amount of time. (Tr. 927.) In response to a *separate question*, Dr. Molina-Vicenty opined that, because of pain, plaintiff would need to take breaks more frequently than every hour during a normal eight-hour workday. (Id.) As such, although Dr. Molina-Vicenty opined that plaintiff would need to lie down during the day and would need to take breaks more frequently than every hour, Dr. Molina-Vicenty did *not* state that plaintiff would have to lie down hourly during the day. It cannot be said, therefore, that the ALJ's mischaracterization of Dr. Molina-Vicenty's statements constitutes a good reason upon which the ALJ could discredit the opinion of this treating physician.

The ALJ also determined to accord little weight to Dr. Molina-Vicenty's opinion inasmuch as the limitations expressed with respect to plaintiff's sitting ability were inconsistent with

plaintiff's lack of testimony regarding "any real sitting limitations." (Tr. 19.) The undersigned notes, first, that plaintiff testified at the November 2008 hearing that his feet go numb if he sits too long, and indeed, his feet were beginning to go numb during the hearing.[42] Plaintiff also testified to experiencing low back pain when he stoops, bends, tries to put on his shoes, or gets dressed. The ALJ did not address this testimony in his decision. A review of the record as a whole shows plaintiff's testimony to be consistent with the extensive medical demonstrating plaintiff's continual complaints to his treating physicians, including Dr. Molina-Vicenty, of numbness in his feet and legs, unresolved by surgeries; constant pain in his hips, low back and knees; as well as increasing pain in his leg while at rest, resulting in additional surgery. Objective medical evidence corroborates these complaints as well, with such evidence including MRI and x-ray results, and multiple findings of tenderness about the low back, positive straight-leg raising, severe muscle spasms about the back, and pain with range of motion exercises about the hips and back. See Driggins v. Bowen, 791 F.2d 121, 124 (8th Cir. 1986) (objective medical evidence includes poor flexation, tenderness in the fourth and fifth vertebrae, limited straight leg raising, and limited range of motion).

---

[42]The undersigned notes that this hearing was less than ninety minutes in duration, and that plaintiff testified to his feet going numb when the hearing was about two-third's completed.

The ALJ accorded little weight to Dr. Molina-Vicenty's opinion by citing certain perceived inconsistencies where they did not exist. Such misapprehensions of the record cast serious doubt upon the ALJ's ultimate conclusion to discount the opinion of this treating physician, and thus his ultimate conclusion regarding plaintiff's disability. See Baumgarten v. Chater, 75 F.3d 366, 369-70 (8th Cir. 1996). Inasmuch as these "inconsistencies" are not supported by the record, and indeed are contrary to the record, it cannot be said that they constitute good reasons for the ALJ to accord little weight to the treating physician's opinion. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005). Upon remand, the Commissioner should review the entire record and reevaluate the weight given to the opinion of Dr. Molina-Vicenty, plaintiff's treating rheumatologist. In the event controlling weight is not accorded to such opinion, the Commissioner must give good, legally sufficient reasons for the weight given, with such reasons to be supported by substantial evidence on the record as a whole.

The manner by which the ALJ determined to accord little weight to the opinion of plaintiff's treating physician is especially troubling when coupled with the ALJ's apparent determination to rely heavily upon the opinion of a nonexamining medical consultant in finding plaintiff to have the RFC to engage in work-related activities. Ms. Bennett rendered her opinion in

January 2008, ten months prior to plaintiff's initial hearing and sixteen months prior to the follow up hearing. Ms. Bennett did not have the benefit of reviewing any medical records obtained subsequent to January 2008, with such medical records documenting the failure of the December 2007 stent procedure, the additional surgery in July 2008 which did not resolve plaintiff's symptoms and indeed resulted in additional complications, plaintiff's treatment from rheumatologist Dr. Molina-Vicenty, and plaintiff's subsequent referral to and treatment by the Department of Neurology. The ALJ's reliance on a dated RFC checklist completed by a nonexamining consultant coupled with his corresponding failure to credit subsequent supporting evidence, including treatment notes of plaintiff's treating physicians that indicate continued, or, as in this case, exacerbated symptoms, is error and does not constitute substantial evidence upon which to find non-disability. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995) (error to rely on remote medical evidence to determine RFC; RFC must reflect what work, if any, claimant is capable of performing at time of the hearing); Morse v. Shalala, 32 F.3d 1228, 1230-31 (8th Cir. 1994) (ALJ erred by relying on old medical report and gave no weight to subsequent supporting evidence, including treating physician's progress notes that indicated continued pain consistent with claimant's subjective complaints).

Accordingly, for the foregoing reasons, the ALJ erred in

his evaluation of the opinion evidence submitted in this cause. Upon remand, the Commissioner should require the ALJ to explain in the decision the weight given to any opinions from treating sources, nontreating sources and nonexamining sources. 20 C.F.R. §§ 404.1527(f)(2)(ii), 416.927(f)(2)(ii). In the event controlling weight is not given to the opinions of plaintiff's treating physicians, including Dr. Molina-Vicenty and Dr. Cowan,[43] the ALJ should provide good, legally sufficient reasons for the weight given such opinions. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

C.   Substantial Evidence on the Record as a Whole

As discussed, supra at Section V.B, above, the instant matter should be remanded to the Commissioner for proper consideration and evaluation of all of the medical evidence of record, including all opinion evidence, with reasons given for the weight accorded thereto. A review of the ALJ's decision in its

---

[43]Dr. Cowan's MSSS was not before the ALJ at the time he rendered his adverse decision in this cause. Nevertheless, the MSSS was considered by the Appeals Council in its determination not to review the ALJ's decision. The Appeals Council's consideration of this evidence requires this Court to determine how the ALJ would have weighed the newly submitted evidence if it had been presented at the administrative hearings. Jenkins v. Apfel, 196 F.3d 922, 924 (8th Cir. 1999) (citing Riley v. Shalala, 18 F.3d 619, 622 (8th Cir. 1994)). As such, the Court would be required to speculate on how the ALJ would have weighed the MSSS had it been before him at the time of his decision. Flynn v. Chater, 107 F.3d 617, 622 (8th Cir. 1997) (citing Riley, 18 F.3d at 622). Inasmuch as this cause shall be before an ALJ upon remand for proper assessment of opinion evidence, the undersigned considers it appropriate for the ALJ upon remand to review Dr. Cowan's MSSS in the first instance and determine the appropriate weight to be given the opinions contained therein.

entirety, however, shows there to be additional errors which further demonstrate the general lack of substantial evidence upon which the ALJ rendered his decision. Although such errors were not raised by plaintiff as specific claims for relief in this cause of action, the egregiousness of the errors warrants at least a limited discussion.

A review of the ALJ's decision in its entirety shows there to be multiple inaccuracies in the ALJ's recitation of plaintiff's medical history in this case, demonstrating the ALJ's less than complete review of the evidence of record. The following is for illustrative purposes only and is not intended to be an exhaustive list of the ALJ's misapprehensions of the record in this case:

- The ALJ characterized plaintiff's December 2007 stenting and bypass procedure to have given plaintiff "relief for an extended period of time." (Tr. 17.) The medical evidence of record, however, shows that plaintiff experienced relief for only three months. Plaintiff thereafter experienced increasingly worse left lower extremity claudication, progressing to rest pain, with significant neuropathy in the left limb, which ultimately resulted in additional surgery. The record also shows this additional surgery to have likewise resulted in only limited and temporary relief.

- The ALJ found, as a fact, that plaintiff had not been prescribed any psychotropic medications and was on "no psychotropic medications at all[.]" (Tr. 17, 19.) The medical evidence of record, however, shows plaintiff to have been prescribed anti-depressant medication continually since February 2007 with such medications being constantly adjusted due to plaintiff's exacerbation of depressive symptoms.

- The ALJ stated in his decision that Dr. Lomax's GAF assessment of 45 was unsupported by any extensive evaluation or examination notes, and that plaintiff's levels of reported depression were "unsupported by the notes in the file[.]" (Tr. 17, 19.) The ALJ wholly fails to address or discuss plaintiff's treatment with Dr. Cowan, which included GAF scores of 45 and 47; his multiple consultations with VA staff members, including social workers and psychologists; and observations by treating physicians of plaintiff's depressive symptoms with recommendations for treatment thereof.

- The ALJ reported plaintiff to have tolerated the July 2008 surgical procedure well. (Tr. 18.) The ALJ fails to discuss, however, the multiple complications resulting from the surgery. Nor does

the ALJ acknowledge Dr. Michael's subsequent
observation that the surgery did not result in much
improvement in plaintiff's circulation.

Where an ALJ's findings are not supported by, and indeed are contrary to substantial evidence on the record as whole, the ALJ's ultimate conclusion that a claimant's impairments are not disabling is undermined. Cf. Baumgarten, 75 F.3d at 368-69.

In addition, in determining a claimant's RFC, an ALJ must consider all relevant evidence, including medical records, the observations of treating physicians and others, and the claimant's description of his limitations. Goff, 421 F.3d at 793. As such, before determining a claimant's RFC, the ALJ must first evaluate the claimant's credibility. Wagner, 499 F.3d at 851; Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005). In determining the credibility of a claimant's subjective complaints, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted).

Here, the ALJ stated only that plaintiff's statements concerning the intensity, persistence and limiting effects of his

symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (Tr. 19.) Other than briefly reciting the bare substance of plaintiff's and his daughter's testimony, the ALJ made no effort to identify how such testimony was inconsistent with other evidence in the record. The ALJ's decision is entirely devoid of any mention of the increasing duration, frequency and intensity of plaintiff's pain, despite multiple physicians' notes and objective findings of such pain. To the extent the ALJ states that plaintiff's pain improved with therapy and medication, the undersigned notes that the ALJ points only to that limited improvement which was related to plaintiff's work-related injury sustained in May 2007. The ALJ's statement that the level of pain reported by plaintiff was not supported by the records of his providers is contrary to substantial evidence in the record. Indeed, the ALJ's decision is entirely devoid of any mention of the significant pain medication prescribed for plaintiff, and its continued failure to provide relief. Nor does the ALJ address plaintiff's inability to obtain relief from the failed surgical procedures. Finally, the ALJ's failure to properly address plaintiff's mental impairment necessarily influenced his evaluation of plaintiff's subjective complaints of pain under the standards set forth in <u>Polaski</u>. As such, the ALJ's conclusion regarding plaintiff's credibility rests on erroneous factual findings and a failure to examine the possibility that plaintiff's mental

impairment aggravated his perception of pain. Accordingly, substantial evidence on the record as a whole fails to support the ALJ's discounting of plaintiff's subjective complaints. <u>See</u> <u>Delrosa v. Sullivan</u>, 922 F.2d 480, 485-86 (8th Cir. 1991) (on remand, ALJ advised to consider aggravating factor posed by possibility that claimant's perception of pain is exacerbated by psychological impairment); <u>Johnson v. Secretary of Health & Human Servs.</u>, 872 F.2d 810, 814 (8th Cir. 1989) ("The basic flaw in the ALJ's [credibility] findings is that the full record was not considered.").

Finally, in light of the errors set out above, including the failure to properly evaluate opinion evidence, the failure to review the entirety of the record, the failure to properly evaluate plaintiff's subjective complaints of pain, and the failure to properly consider evidence of plaintiff's mental impairment, it cannot be said that the ALJ's RFC determination is supported by substantial evidence on the record as a whole. Where, as here, a vocational expert's testimony is given in response to a hypothetical question based upon a faulty determination of a claimant's RFC, such testimony cannot constitute sufficient evidence that the claimant is able to engage in substantial gainful employment. <u>Lauer v. Apfel</u>, 245 F.3d 700, 706 (8th Cir. 2001). The ALJ therefore erred in relying on the testimony of the vocational expert in determining plaintiff not to be disabled, inasmuch as such testimony was based upon a faulty hypothetical question.

## VI.  Conclusion

A review of the record shows that the ALJ failed to consider and properly evaluate all of the relevant evidence in making his determination that plaintiff was not under a disability at any time through the date of the decision.  As such, the Commissioner's decision is not supported by substantial evidence on the record as a whole and the matter should be remanded for further consideration.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be reversed and that this cause be remanded to the Commissioner for further proceedings.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **June 29, 2011.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this  _15th_  day of June, 2011.

- 100 -